**Jay Mahlon HILL and, Linda Maria Lembo Hill, Appellants,**

v.

**The STATE of Texas, Appellee.**

**Nos. 1179–94 & 1180–94.**

Court of Criminal Appeals of Texas, En Banc.

Jan. 10, 1996.

---

Robert Ford, David L. Richards, Fort Worth, for appellants.

Tanya S. Dohoney, Asst. Dist. Atty., Fort Worth, Robert A. Huttash, State's Atty., Austin, for State.

## OPINION ON APPELLANTS' PETITIONS FOR DISCRETIONARY REVIEW

MANSFIELD, Judge.

Appellants, husband and wife, were charged by separate indictments with the offense of injury to a child. Tex.Penal Code § 22.04. More specifically, they were charged with "intentionally and knowingly, by omission, [causing] disfigurement and deformity, serious bodily injury and serious physical and mental deficiency and impairment to their son, Stephen Hill, a child younger than fifteen years of age, by failure to provide food and medical care...."

The State filed notice of its intent to seek an affirmative finding that a deadly weapon was used in a manner that caused Stephen's death. The chains, belts and locks that were used to prevent Stephen from obtaining food (Stephen died of starvation) were identified by the State as the deadly weapon(s). Testimony at trial showed Stephen was chained for approximately the eighteen months prior to his death.

The jury found appellants guilty of injury to a child by omission. The jury also found that appellants used a deadly weapon in the commission of the offense, and assessed punishment at 99 years' confinement in the Texas Department of Criminal Justice—Institutional Division. The court of appeals affirmed appellants' convictions and sentences. *Hill v. State*, 881 S.W.2d 897 (Tex.App.— Fort Worth 1994).

Texas Penal Code § 1.07(a)(17) defines a deadly weapon as:

(A) a firearm or anything manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury; or

(B) anything that in the manner of its use or intended use is capable of causing death or serious bodily injury.

■ It is clear that chains, belts and locks are not designed, made or adapted for the purpose of inflicting death or serious bodily injury, so they are not deadly weapons *per se* as defined under § 1.07(a)(17)(A). However, items that are not deadly weapons *per se*

under § 1.07(a)(17)(A) have been found to be deadly weapons by nature of their *use* or *intended use* under § 1.07(a)(17)(B). *Thomas v. State*, 821 S.W.2d 616, 619 (Tex.Cr.App. 1991). The use or intended use must be capable of causing death or serious bodily injury.

> "Kitchen knives, utility knives, straight razors and eating utensils are manifestly designed and made for other purposes and, consequently, do not qualify as deadly weapons unless actually used or intended to be used in such a way as to cause death or serious bodily injury within the meaning of § 1.07(a)(11)(B)."

*Thomas,* at 620. (Note: § 1.07(a)(11)(B) is now § 1.07(a)(17)(B)).

■ The State introduced evidence that the restraints used to prevent Stephen from obtaining food were used in a manner so as to cause serious bodily injury or death—namely, his starvation.[1] This evidence was constitutionally sufficient to support a rational jury's finding that appellants used a deadly weapon in the commission of the offense of injury to a child. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

Appellants assert in their fourth ground for review that an affirmative finding as to use of a deadly weapon may not be made where the predicate offense is an act of omission. Appellants are correct in their assertion that, by definition, an act of omission is a failure to act. In the present case, the State was required to prove beyond a reasonable doubt that appellants failed to provide food and medical attention to Stephen in violation of their legal duty to do so.

Appellants do not contest the jury's finding of guilt as to the predicate charge of injury to a child by omission. Appellants are correct in stating that an affirmative finding of a deadly weapon requires the State to prove beyond a reasonable doubt appellants used a deadly weapon. See Tex.Penal Code §§ 1.07(a)(11) and 1.07(a)(34) (1990).

In *Patterson v. State*, 769 S.W.2d 938 (Tex. Cr.App.1989), this Court held, in affirming the judgment of the court of appeals, that " 'used [a deadly weapon] during the commission of a felony offense' refers certainly to the wielding of a firearm with effect, but it extends to *any* employment of a deadly weapon, even its simple possession, if such possession facilitates the associated felony." *Patterson,* at 941.

Appellants used the chains, belts and locks to restrain Stephen to deprive him of food. In so using these objects, appellants committed an affirmative, conscious and intentional act. The conduct here goes far beyond *Patterson,* where we found that the defendant's mere *possession*—no actual employment—of a firearm, along with possession of narcotics, constituted the use of a deadly weapon. Here, we have actual use, without which the predicate offense likely would not have been possible.[2]

■ Our opinion is consistent with *Patterson* in that it requires the State to prove, beyond a reasonable doubt, that the charged individual employed or used a deadly weapon so as to facilitate the associated felony before an affirmative finding as to use of a deadly weapon may be made. Thus, the State must prove "use." Additionally, in the present case, as the chains, locks and associated

---

1. The jury instruction stated:

"Deadly weapon" means anything that in the manner of its use or intended use is capable of causing death or serious bodily injury.

Now, if you find from the evidence beyond a reasonable doubt that the defendant(s) used a chain, rod, belts or locks, either individually or in combination, and you further find that the chain, rod, belts or locks, either individually or in combination was a deadly weapon as previously defined; or if you find that the defendant(s) was a party to the offense and knew that the chain, rod, belts or locks, either individually or in combination, would be used, and you further find that the chain rod, belts or locks, either individually or in combination, was a deadly weapon, then you will answer the Special Issue "Yes." If you do not so believe, or if you have a reasonable doubt thereof, you will answer the Special Issue "No."

Special Issue

Do you find beyond a reasonable doubt that the Defendant(s) used a deadly weapon? Answer "Yes" or "No."

2. Appellants do not cite any authority to support their proposition that *Patterson*'s "facilitation of an associated felony" language applies only to cases involving deadly weapons *per se* as defined in § 1.07(a)(17)(A).

items were not deadly weapons per se as defined in Texas Penal Code § 1.07(a)(11)(A), the State had to prove beyond a reasonable doubt that they were deadly weapons because, in the manner of their use or intended use, they were capable of causing death or serious bodily injury (as defined in Texas Penal Code § 1.07(a)(34)), per Texas Penal Code § 1.07(a)(11)(B). Appellants do not demonstrate that the State's burden of proof on the affirmative finding as to a deadly weapon is in any way affected by whether the associated felony is an act of omission or commission. Appellants' fourth ground for review is overruled.

Appellants argue, in their first and second grounds for review, that the wording of the special issue paragraph is fatally defective because it does not contain the phrase "during the commission of the charged offense." Appellants assert this phrase is mandated by Texas Code of Criminal Procedure, article 42.12, section 3(g)(a)(2). Alternatively, appellants claim the charge is erroneous and constituted egregious error under *Almanza v. State,* 686 S.W.2d 157 (Tex.Crim.App. 1984).

In *Polk v. State,* 693 S.W.2d 391 (Tex. Crim.App.1985), we described the methods by which an affirmative finding may be made. "If the indictment by allegation places the issue before the trier of fact (i.e. "... by stabbing him with a knife, a deadly weapon ...") then an affirmative finding is de facto made when the defendant is found guilty 'as charged in the indictment.'" *Polk,* at 394. See also *Ruben v. State,* 645 S.W.2d 794 (Tex.Crim.App.1983). In the present case, the indictment is silent on the deadly weapon issue and the State gave proper notice of its intent to seek an affirmative finding.

An affirmative finding may also be made if the trier of fact responds to a special issue submitted during the punishment phase of the trial. We do note, however, that article 37.07, section 1(a) does not mandate that the issue be submitted at the punishment phase of the trial and could be submitted during the guilt-innocence phase. *Polk,* at 394, fn. 3. For the purposes of article 42.12, section 3(g)(a)(2), an affirmative finding may be made if, during the punishment phase, the jury is presented with and responds in the affirmative to a special issue regarding the defendant's use or exhibition of a deadly weapon during the commission of the charged offense.

*Polk,* however, does not give any guidance as to what, if any, specific language must be contained in a special issue regarding a deadly weapon affirmative finding. Indeed, a special issue does not even have to be submitted for an affirmative finding to be entered if the issue is properly presented in the indictment. As the indictment in the present case does not allege use of a deadly weapon, a special issue charge was required. *Polk* does not, however, support appellants' assertion that omission of the phrase "during commission of the charged offense" means "the jury's affirmative answer to the special issue in the present case has no legal effect whatsoever."

■ This Court held in *Nickerson v. State,* 782 S.W.2d 887 (Tex.Crim.App.1990), that "a charge must be treated in its entirety with regard to the connection and interdependence of its several parts." *Nickerson,* at 891. In the present case, the jury instructions on the special issue contain an application paragraph. The application paragraph describes acts which actually occurred during commission of the offense and constitute the res gestae of the offense. The jury had to find beyond a reasonable doubt that appellant committed these acts using the items alleged by the State to be deadly weapons in order to answer the special issue charge in the affirmative. In effect, the specific language of the application paragraph increased the State's burden of proof beyond what would have been created under the generic phrase "during the commission of the charged offense." Increasing the State's burden of proof only inured to appellants' benefit and cannot be said to be error, much less reversible error. See *State v. Kinsey,* 861 S.W.2d 383 (Tex.Crim.App.1993) and *State v. Garcia,* 861 S.W.2d 386 (Tex.Crim. App.1993).

■ Assuming, *arguendo,* that omission of the phrase "during commission of the

charged offense" is error, it is charge error. Appellants did not object to omission of this phrase at the time of the proceedings when the court, pursuant to Article 36.14, provided appellants with a written copy of its proposed charge on the deadly weapons special issue. Errors alleged to have been made in a jury charge are subject to review under the standards established by this Court in *Almanza v. State*, 686 S.W.2d 157, 160 (Tex.Crim.App. 1984) (opinion on rehearing) controls.

"If the error in the charge was the subject of a timely objection in the trial court, then reversal is required if the error is 'calculated to injure the rights of defendant,' which means no more than there must be *some* harm to the accused from the error. In other words, an error which has been properly preserved by objection will call for reversal as long as the error is not harmless. On the other hand, if no proper objection was made at trial and the accused must claim that the error was 'fundamental,' he will obtain a reversal only if the error is so egregious and created such harm that he 'has not had a fair and impartial trial'—in short, 'egregious harm.'

In both situations the actual degree of harm must be assayed in light of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Almanza*, at 171.

Appellants concede they did not object to omission of the phrase "during the commission of the charged offense" from the special issue instruction submitted on use of a deadly weapon.[3] Therefore, we must determine if the court of appeals correctly concluded under *Almanza* that appellants did not suffer egregious harm as a result of the omission of the phrase "during the commission of the charged offense" from the charge on the special issue. We find that the court of appeals correctly found no egregious harm resulted.

The record shows that the only time appellants used the items alleged by the State to be deadly weapons was during the commission of the underlying offense of injury to a child by omission. There was no evidence that the items were used to hit Stephen or were used for any other purpose. The only logical conclusion one could draw from the jury's answer to the special issue, as submitted, is that appellants used the items during the commission of the offense. Furthermore, appellants do not contest the court of appeals' affirmance as to their conviction of the underlying offense. The appellants suffered no egregious harm as a result of the omitted phrase from the language submitted on the special issue. We overrule appellants' grounds for review numbers one and two.

In ground for review number three appellants aver it was improper for the trial court, during the punishment phase of the trial, to give the jury two charges on parole. One charge described the law governing parole if the jury answered "no" to the special issue as to an affirmative finding of a deadly weapon; the other charge described the parole law which would apply to appellants if the jury answered the deadly weapons special issue in the negative. In effect, the jury was informed as to the effect of a "yes" answer or a "no" answer to the special issue on the amount of time appellants would have to serve before appellants would be eligible for parole.

Texas Code of Criminal Procedure, article 37.07, section 4, then in effect (1992), provided for two different parole instructions. Section 4(a), applicable to a defendant convicted of an offense described in article 42.12, section 3(g)(a)(1) or if the judgment contained a deadly weapon affirmative finding under section 3(g)(a)(2), read in relevant part:

Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment, he will not become eligible for parole until the actual time served equals one-fourth of the sentence imposed or 15 years, whichever is less, without consider-

---

3. Appellants did object to the legal propriety of submission of a deadly weapon special issue where the charged offense is one of omission, but we decided this matter in a manner adverse to appellant in our disposition of ground for review four. Appellants did not object to the wording of the special issue charge, however.

ation of any good conduct time he may earn. If the defendant is sentenced to a term of less that six years, he must serve at least two years before he is eligible for parole. Eligibility for parole does not guarantee that parole will be granted.

Section 4(b), then in effect (1992), which was applicable to a defendant convicted of an offense not described in article 42.12, section 3(g)(a)(1) or where there was *no* deadly weapon affirmative finding under section 3(g)(a)(2), read in relevant part:

Under the law applicable in this case, if the defendant is sentenced to a term, of imprisonment he will not become eligible for parole until the actual time served plus any good conduct time earned equals one-fourth of the sentence imposed or 15 years, whichever is less. Eligibility of parole does not guarantee that parole will be granted.

Appellants objected to the State's proposed submission of the deadly weapons special issue at the guilt-innocence phase of the trial. The trial court agreed with appellants and submitted the special issue at the punishment phase, even though this Court has never held that it is improper to submit the deadly weapons special issue at the guilt-innocence phase. *Luken v. State,* 780 S.W.2d 264, 268 (Tex.Crim.App.1989). See also *McIntosh v. State,* 855 S.W.2d 753, 771 (Tex. App.—Dallas 1993, pet. ref'd.) As the court of appeals below states, the wording of sections 4(a) and 4(b) of article 37.07 "implicitly requires the deadly weapon issue to be submitted at the guilt-innocence stage so that the trial court will know which parole law instruction to give the jury during the punishment phase." *Hill,* 881 S.W.2d at 907. We agree that the *better* practice is to submit the deadly weapons special issue charge at the guilt/innocence phase of the trial.

■ There was no submission on the deadly weapons special issue during the guilt-innocence phase of the trial as a result of appellant's objection. The trial court was given no alternative but to give the jury two parole instructions at the punishment phase—one applicable in the event the jury answered the special issue in the affirmative and the other applicable in the event the jury

answered the special issue in the negative when the special issue was submitted. Appellants do not cite any authority in support of their contention the trial court erred in submitting two parole law instructions. Even if it is assumed, *arguendo,* that it was error, appellants invited it and cannot complain of it on appeal. *Tucker v. State,* 771 S.W.2d 523, 534 (Tex.Crim.App.1988); *cert. denied* 492 U.S. 912, 109 S.Ct. 3230, 106 L.Ed.2d 578 (1989).

The judgment of the court of appeals is affirmed.

OVERSTREET and MALONEY, JJ., concur in the result.

CLINTON, J., dissents.

MEYERS, Judge, concurring.

I agree with the dissent that omission to perform a duty imposed by law never constitutes the use of a deadly weapon. It does not follow, however, that a deadly weapon can never be used or exhibited during commission of an offense which has as an essential element the omission to perform a duty imposed by law. Moreover, even were we to hold that a deadly weapon is not used or exhibited during the commission of an offense unless its use or exhibition somehow facilitates commission of that offense, it would still not follow that a deadly weapon can never be used to facilitate an offense of omission. The instant cause is a perfect example.

The appellants in this case starved one of their children to death. They did it slowly over a period of more than a year by preventing him from obtaining food. At first, they simply ordered him not to eat, but when hunger at last overcame his fear of reprisal, he secretly stole food from the kitchen. Appellants soon discovered his scheme, however, and he was thereafter chained up until he lapsed into a coma and finally died.

As is so often the case in our society of complex laws, the appellants' conduct violated a number of penal statutes. The State chose to prosecute them for violating section 22.04 of the Penal Code, a crime known popularly as Injury to a Child. This statute

makes it a felony to cause serious physical or mental deficiency or impairment, disfigurement, deformity, or serious bodily injury to a child younger than fifteen years of age. It is a crime to cause such injury whether it is done by act or by omission. The difference is that an act is "a bodily movement, whether voluntary or involuntary, and includes speech" while an omission is a "failure to act." Penal Code § 1.07(a)(1), (34). In the present context, it is the difference between keeping from food and not feeding.

Clearly, appellants could have been charged and convicted for injuring their son under either theory (perhaps even both theories), since the evidence is easily sufficient to prove both that they did not give him food and that they actively prevented him from getting food for himself. The indictment, however, charged only that they injured him "by omission" in that they "fail[ed] to provide [him with] food." The dissent intimates rather strongly that, had appellants instead been charged with injuring their child by the act of tying him up, the proof would have been sufficient to show that a deadly weapon was used during commission of the offense. But because appellants were not charged with the "act" of starving their son, the dissent maintains that the jury's finding of deadly weapon use was irrational.

I do not agree. We must bear in mind that the jurors in this case were instructed accurately both as to the meaning of the term "deadly weapon" and as to the conditions under which they might find that appellants used or exhibited a deadly weapon during commission of the offense. Based upon these instructions and the evidence adduced at trial, the jurors unanimously found as a matter of fact that the "chain, rod, belts, or locks" by means of which appellants restrained their son from obtaining food was "in the manner of its use or intended use . . . capable of causing death or serious bodily injury." They were, of course, right.

The dissent thinks they were wrong, however, and it seems likely to me that this belief comes from a strong intuition that use of a deadly weapon "during commission of an offense" means that the weapon was actually used to commit the offense. I admit that

this is an attractive reading of the statute in some situations. For example, had appellants been hatching a plot with their friends to sell illegal drugs to school children while their own son, wrapped in chains, lay starving in the corner, it would be a little strange to suggest that a deadly weapon was used during commission of the criminal conspiracy merely because appellants were, "during" the same period of time, committing a different offense involving use of a deadly weapon. But, on the other hand, we have never required that the deadly weapon be the actual manner or means by which the charged offense was committed. Thus, for example, we have upheld a jury's finding that a deadly weapon was used during commission of a drug possession offense, even though it was not the manner or means of possession, because it "facilitated" the defendant's possession of the drugs. *Patterson v. State,* 769 S.W.2d 938 (Tex.Crim.App.1989). It seems we want a deadly weapon to be connected with the offense more than just fortuitously, but are not willing to insist that it be the very instrumentality of the crime, before upholding a finding that it was "used."

I suppose we will someday be confronted with a case like my hypothetical, where two unconnected crimes, only one of which actually involves the use or exhibition of a deadly weapon, are committed simultaneously by the same person. We will then have to decide whether a deadly weapon finding may be entered in the case not involving use or exhibition of the weapon merely because it was used or exhibited "during" commission of the offense. Frankly, I am uncertain how to answer that question. Fortunately, however, it is not the question presented here.

In the instant cause, appellants' use of a lock and chain to prevent their son from getting food for himself was actually intended to facilitate, and did facilitate in fact, the success of their plan to withhold food from him. In a sense, it was the commission of one crime, injury by an act, to help accomplish another, injury by an omission (if, indeed, these are different crimes at all). I have no doubt under these circumstances that a deadly weapon was used during the offense of omission, not just because it hap-

pened contemporaneously, but because it was an integral part of appellants' strategy to starve their son. Accordingly, I concur with the opinion of the Court.

BAIRD, Judge, concurring and dissenting.

Were it not for the truly gruesome and horrible cases we are called upon to review, this would be an easy job and the law would be easy to apply. But when one reads a record such as the one in the instant case, it is difficult to focus only on the legal issues raised and to ignore the moral depravity present on every page. A case such as this where a majority is unable to maintain its impartiality and objectivity in resolving the issue proves the old adage "bad facts make bad law." With this said, I dissent to the conclusion that the law permits an affirmative finding of a deadly weapon for an offense committed by omission. However, because appellants invited the jury charge error at the punishment phase of the trial, I am able to concur in the conclusion that the error does not warrant a new punishment hearing.

## I.

A recitation of the facts is necessary. On November 3, 1991, the White Settlement Police Department received a 911 hang-up call. The dispatcher returned the call and learned that appellant, Linda Hill, had called 911 but hung up. Hill informed the dispatcher that she and her husband had not been good parents because, as a form of discipline, they had not been feeding their children. Emergency Medical Technicians were dispatched

to appellants' home where they discovered the victim, appellants' oldest son, in pediatric full arrest.[1] The victim was transferred to the hospital where he remained comatose until his death. At the hospital, appellants stated they restrained the victim because he would get up at night and leave their home. According to appellants, they first used a sheet to secure him, but when that failed, they resorted to a using a chain and padlock around his wrist or ankle.

Appellants were charged by separate indictments with injury to a child by omission. Tex.Penal Code Ann. § 22.04.[2] The indictments against appellants charged them with committing the offense by intentionally and knowingly failing to provide food and medical care to the victim which resulted in his death.[3] The State subsequently filed notice of an intent to seek a deadly weapon finding, alleging "that the chain, rod, belts and locks that were used to restrain [the victim] were used in a manner that caused the death of [the victim]."

At trial, the State submitted evidence that the victim died of starvation. Medical experts testified the victim suffered from chronic malnutrition which, at the time of death, had reached such a state that his body was deteriorating by "eating itself." Although appellants admitted to withholding food from the victim for three to four months, the medical experts concluded, based upon the victim's growth as measured against established growth patterns in children, the starvation occurred over a period of

---

1. At trial "pediatric full arrest" was described as "[n]ot breathing, no pulse, blood pressure or respirations."

2. Tex.Penal Code § 22.04 provides in pertinent part:
(a) A person commits an offense if he intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly, by omission, causes to a child ...:
    (1) serious bodily injury;
    (2) serious physical or mental deficiency or impairment;
    (3) disfigurement or deformity; or
    (4) bodily injury.
(b) An omission that causes a condition described by Subsections (a)(1) through (a)(4) of this section is conduct constituting an offense under this section if:

(1) the actor has a legal or statutory duty to act; or
(2) the actor has assumed care, custody, or control of a child....

3. Specifically, the indictments alleged appellants:

intentionally and knowingly, by omission, cause[ed] disfigurement and deformity, serious bodily injury, and serious physical and mental deficiency and impairment to [the victim], a child younger than fifteen years of age, by failure to provide food and medical care at a time when the defendant[s] had assumed the care, custody and control of said child and had a legal duty to act to provide protection, food, shelter, and medical care for said child ...

several years. The victim's younger brother testified that, as punishment to their sons, appellants had been withholding food for approximately five to six years. At times, the boys would go without food for three or four days, and when they did eat, it was usually bologna and cheese sandwiches. Moreover, on the occasions in which appellants fed their children, they would often alter the food to give it a bad taste.

The victim's brother further testified appellants initially established a rule that if the boys were hungry they would have to ask for food. This rule was subsequently changed, however, so that the boys would be punished when they requested food. Although the victim's brother would remain hungry during these times, the victim would attempt to take food from the kitchen. In order to prevent the victim from getting food on his own, appellants employed a number of restraining devices, including a chain, a metal rod, locks and belts. The victim's brother testified appellants used the restraints for approximately one and a half years. The jury found appellants guilty of injury to a child by omission. The jury also found that appellants used a deadly weapon in the commission of the offense.[4]

On appeal, appellants contended the State was precluded from seeking an affirmative finding of a deadly weapon because their convictions were predicated upon an omission rather than an act. *Hill v. State,* 881 S.W.2d 897, 903 (Tex.App.—Fort Worth 1994). Relying upon *Patterson v. State,* 769 S.W.2d 938 (Tex.Cr.App.1989), the Court of Appeals held the State could seek the affirmative findings:

"... When [the victim] went against appellants' punishment method and sought out food on his own, appellants took steps to restrain [the victim] by chaining him to a cabinet with a chain, a metal rod, some belts and some locks. Thus, these poten-

tial deadly weapons were used by appellants to "facilitate" their goal of depriving [the victim] of food...."

*Hill,* 881 S.W.2d at 904.

This is an issue of first impression, namely, whether an affirmative finding of the use of a deadly weapon may be made where the predicate offense is committed by omission. Appellants contend that, as a matter of law, the State may not obtain an affirmative finding because the prosecution theory is predicated upon failure to provide food and failure to seek medical attention for the complainant, while an affirmative finding of a deadly weapon requires a defendant to commit an affirmative act. *Appellants' Brief,* pg. 22.

## II.

### A.

Modern legal theory, as expressed through the Model Penal Code, and reflected in the Texas Penal Code, Seth S. Searcy, *Forward to the Texas Penal Code,* at xxv, (1974); *and, Ex parte Pruitt,* 610 S.W.2d 782, 783 (Tex. Cr.App.1981) (Clinton, J., concurring), recognizes a conceptual distinction between an "act" and an "omission." Wayne R. LeFave and Austin W. Scott, Jr., *Criminal Law,* § 25, at 177–178 (West 1972). *See also,* Jerome Hall, General Principles of Criminal Law, 208 (2nd ed. 1960). ("Whatever religion and ethics teach, the prevailing attitudes draw sharp distinctions between overt action and passivity."). Our Penal Code provides that a person commits an offense only if he commits an *act* or an *omission.* Tex.Penal Code Ann. § 6.01(a). An "act" is defined as "a bodily movement, whether voluntary or involuntary, and includes speech." Tex.Penal Code Ann. § 1.07(a)(1). By contrast, an "omission" is defined as a "failure to act."

---

4. Specifically, the jury instruction stated:
   "Deadly weapon" means anything that in the manner of its use or intended use is capable of causing death or serious bodily injury.
   Now, if you find from the evidence beyond a reasonable doubt that the Defendant used a chain, rod, belts, or locks, either individually or in combination, and you further find that the chain, rod, belts, or locks, either individually or in combination was a deadly weapon as previ-

ously defined; or if you find that the Defendant was a party to the offense and knew that the chain, rod, belts, or locks, either individually or in combination, would be used, and you further find that the chain, rod, belts, or locks, either individually or in combination, was a deadly weapon, then you will answer the Special Issue "Yes". If you do not so believe, or if you have a reasonable doubt thereof, you will answer the Special Issue "No".

Tex.Penal Code Ann. § 1.07(a)(34). Clearly, the two are antithetical concepts: while an "act" encompasses an affirmative action on the part of a person, an omission encompasses a forbearance of action. Typically, an offense committed by omission involves a failure of the defendant to perform an affirmative action when he has a legal duty to do so. *See generally, Billingslea v. State,* 780 S.W.2d 271, 271–277 (Tex.Cr.App.1989).

### B.

Texas Code of Criminal Procedure article 42.12, § 3g(a)(2) provides for an affirmative finding of the use of a deadly weapon

> ... when it is shown that a deadly weapon as defined in Section 1.07, Penal Code was *used* or exhibited during the commission of a felony offense or during immediate flight therefrom, and that the defendant used or exhibited a deadly weapon or was a party to the offense and knew that a deadly weapon would be used or exhibited....[5]

Whether art. 42.12, § 3g(a)(2) permits an affirmative finding of the use of deadly weapons where the offense is based upon an omission by the defendant requires an examination of the verb "use" in the context of a "deadly weapon." In *Patterson v. State,* 769 S.W.2d 938 (Tex.Cr.App.1989), we addressed the meaning of "use of a deadly weapon" for the purposes of an affirmative finding under art. 42.12, § 3g(a)(2). We explained the verb "use" in the context of "using a deadly weapon" must "be 'read in context and construed according to rules of grammar and usage.'" *Id.,* at 940–941 (quoting Tex.Gov't Code Ann. § 311.011(a). *See also, Tyra v. State,* 897 S.W.2d 796, 797 (Tex.Cr.App.1995); *and, Walker v. State,* 897 S.W.2d 812, 814 (Tex.Cr. App.1995). Therefore, any construction of "use" under art. 42.12, § 3g(a)(2) should comport with a reasonable application of the English language. *Tyra,* 897 S.W.2d at 797; *and; Walker,* 897 S.W.2d at 814. *See also, Boykin v. State,* 818 S.W.2d 782, 785 (Tex.Cr.

App.1991) (When interpreting the intent of a statute, courts attempt to discern the fair, objective meaning of the text at the time of the statute's enactment).

According to the general meaning of "use," the use of an object entails an affirmative act. A person uses an object by actively employing it in some manner. For example, one uses a hammer to drive a nail, or uses water to extinguish a fire. The necessity of activity on the part of a person is inherent within the linguistic concept of "using" an object. Indeed, I cannot conceive of a set of circumstances in which a person may "use" an object absent an affirmative act.[6]

This analysis has been consistently employed in our decisional authority. In *Thomas v. State,* 821 S.W.2d 616 (Tex.Cr.App. 1991), while addressing the statutory requirements to constitute a deadly weapon for the purposes of an affirmative finding, we recognized the two distinct classifications of deadly weapons. Tex.Penal Code Ann. § 1.07(a)(17) defines a deadly weapon as either:

> (A) a firearm or anything manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury; or
>
> (B) anything that in the manner of its use or intended use is capable of causing death or serious bodily injury.

Under § 1.07(a)(17)(A),[7] objects which are capable of causing death or serious bodily injury by virtue of their design, such as firearms, are considered to be deadly weapons *per se.* *Thomas,* 821 S.W.2d at 618. Therefore, to reach an affirmative finding, the State must prove the object is "manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury[.]" *Id.,* at 620. We additionally noted that objects which are not inherently dangerous may also be found to be deadly weapons under § 1.07(a)(17)(B). However, whether an object *not* inherently dangerous consti-

---

5. All emphasis is supplied unless otherwise indicated.

6. I agree with the plurality that appellants engaged in the affirmative acts to restrain the victim. However, this finding is inconsequential to our resolution of the present legal issue. These

affirmative acts were not the basis of the allegations. To the contrary, appellants were charged with the failure to fulfill a legal duty, i.e. an omission.

7. At the time of Thomas' trial, § 1.07(a)(17) was found at § 1.07(a)(11).

tutes a deadly weapon within the meaning of § 1.07(a)(11)(B) depends upon whether the *manner* of its use or intended use is capable of causing death or serious bodily injury. *Id.*, at 620. For example, while a telephone cord or a feather pillow are not normally deadly weapons, they become so if the manner of their use was to strangle or smother a victim. *See, id.*

Consequently, established case law recognizes the necessity of an affirmative act and causality between the use of a deadly weapon and the actual or potential injury. This principle is exemplified in a number of cases in which this Court and the courts of appeals have upheld affirmative findings of the use of a deadly weapon. *See, Walker*, supra, (defendant used automobile as deadly weapon by colliding with victim); *Tyra*, supra (same); *Stanul v. State*, 870 S.W.2d 329 (Tex.App.—Austin 1994) (defendant used floor as deadly weapon by striking victim's head against it); *Lozano v. State*, 860 S.W.2d 152 (Tex.App.—Austin 1993) (defendant used lighter as deadly weapon by using it to start a fire); *Enriquez v. State*, 826 S.W.2d 191 (Tex.App.—El Paso 1992) (defendant used soft drink bottle as deadly weapon by striking victim with it); *Escobar v. State*, 799 S.W.2d 502 (Tex.App.—Corpus Christi 1990) (baseball bat used to bludgeon victim constituted deadly weapon); *Cooper v. State*, 773 S.W.2d 749 (Tex.App.—Corpus Christi 1989) (defendant used hands as a deadly weapon by dropping infant to floor); *Rice v. State*, 771 S.W.2d 599 (Tex. App.—Houston [14th Dist.] 1989) (defendant used gasoline as deadly weapon by pouring it over victim and then igniting it); *Johnson v. State*, 770 S.W.2d 72 (Tex.App.—Texarkana 1989) (defendant used hands and feet as deadly weapons by beating and kicking victim to death); *Roberts v. State*, 766 S.W.2d 578 (Tex.App.—Austin 1989) (defendant used truck as deadly weapon in colliding with car, injuring and killing occupants); *Harper v. State*, 753 S.W.2d 516 (Tex.App.—Houston [1st Dist.] 1988) (defendant used rope or cord as deadly weapon by tying it around victims's neck, restricting her breathing); *Shockley v. State*, 747 S.W.2d 470 (Tex.App.—Houston [1st Dist.] 1988) (defendant used fabric or hands as deadly weapon by strangling victim); *Cervantes v. State*, 706 S.W.2d 685

(Tex.App.—Houston [14th Dist.] 1986) (defendant used board as deadly weapon by striking victim with it); *Garza v. State*, 695 S.W.2d 726 (Tex.App.—Dallas 1985) (by placing broken metal belt buckle in his hand when striking at officer, defendant used the belt buckle as deadly weapon); *Terry v. State*, 672 S.W.2d 236 (Tex.App.—Waco 1983) (defendant used plastic bag as weapon by placing it over victim's head, suffocating her), *rev'd in part on other grounds*, 692 S.W.2d 496 (Tex.Cr.App.1985).

Accordingly, when art. 42.12, § 3g(a)(2) and Tex.Penal Code Ann. § 1.07(a)(17)(B) are considered together, an object is subject to an affirmative finding of a deadly weapon only when it is *"actually used ... in such a way as to cause death or serious bodily injury...."* *Thomas*, 821 S.W.2d at 620. *See also, Walker*, 897 S.W.2d at 814; *Tyra*, 897 S.W.2d at 798. In other words, an object is a deadly weapon under § 1.07(a)(17)(B) when it is actually used in a manner which causes, or has the potential to cause, death or serious bodily injury.

### III.

Both the plurality and Judge Meyers in his concurring opinion rely upon *Patterson v. State*, 769 S.W.2d 938 (Tex.Cr.App.1989). The plurality argues "appellants committed an affirmative, conscious and intentional act," and finds the State proved "actual use" of a deadly weapon. *Ante*, 913 S.W.2d at 583. Judge Meyers cites no authority other than *Patterson* to support his belief that art. 42.12 § 3g(a)(2) does not require proof the "weapon was actually used to commit the offense." *Ante*, 913 S.W.2d at 587. Those opinions follow the State argument that an affirmative finding was appropriate in the instant case because, under *Patterson*, appellants used the restraining devices to "facilitate" their goal of keeping food from the complainant, thereby "facilitat[ing] the associated felony of injury to a child by omission." *State's Brief on the Merits*, pg. 41. The reliance upon *Patterson* is misplaced.

### A.

In *Patterson*, we addressed whether the defendant's mere possession of a firearm

along with possession of narcotics constituted the use of a deadly weapon. Patterson was arrested in the course of a drug raid. As the police entered the residence, Patterson, who was sitting on a sofa, stated: "I have a gun right here, but I'm not going to touch it." *Id.*, at 939. The police retrieved a pistol located between Patterson's leg and the sofa. They also retrieved from an end table a wallet containing a large sum of money, a bag containing methamphetamine, miscellaneous drug paraphernalia and several rounds of ammunition which fit the seized pistol. *Ibid.* During Patterson's trial for possession of methamphetamine, the State sought an affirmative finding of the use of a deadly weapon, contending Patterson's possession of the pistol constituted "use" in that the pistol was used to "protect his drugs and to facilitate their possession." *Id.*, at 940. The jury found, and the trial court's judgment reflected, that a deadly weapon was used during the commission of the charged offense. The Court of Appeals affirmed. *Patterson v. State*, 723 S.W.2d 308 (Tex.App.—Austin 1987). We granted review to determine whether the Court of Appeals erred in defining "use" to mean "any employment of a deadly weapon, *even simple possession, if such possession* facilitates the associated felony." *Patterson*, 769 S.W.2d at 939.

We initially observed that "*all* felonies are theoretically susceptible to an affirmative finding of the use of a deadly weapon." *Id.*, 769 S.W.2d at 940 (Emphasis in original). We further explained:

> ... "use" is commonly employed to describe conduct in which the verb's object, again, in this case a deadly weapon, is utilized in order to achieve a purpose. In other words, the deadly weapon must be utilized, employed, or applied in order to achieve its intended result: "the commission of a felony offense or during immediate flight therefrom."

*Id.*, at 941. We then went on to explain:

> Thus, "used ... a deadly weapon" during the commission of the offense means that the deadly weapon was employed or utilized in order to achieve its purpose.... Therefore, the court of appeals was correct when it stated that " 'used ... during the

commission of a felony offense' refers certainly to the wielding of a firearm with effect, but it extends as well to *any* employment of a deadly weapon, even its simple possession, if such possession facilitates the associated felony."

*Id.* We upheld the Court of Appeals' conclusion that a rational trier of fact could have found that Patterson "used" the pistol during the commission of the felony offense of possession of the contraband. *Id.*, at 942.

### B.

While the plurality believes the instant case fits within *Patterson*'s "facilitation of the offense" framework, the "facilitation" language must be examined under the factual context of *Patterson*. In *Patterson*, the State sought an affirmative finding of the use of a pistol despite the fact Patterson neither fired his pistol nor threatened the police with it. Patterson contended that the mere possession of a pistol, without more, could not constitute the "use" of a deadly weapon in a prosecution for drug possession. *Id.*, 769 S.W.2d at 940. After noting the intent behind art. 42.12, § 3g(a)(2) was to deter the use of weapons in the commission of an offense, we held Patterson "used" the pistol to facilitate the offense of possession of methamphetamine "*in the sense that the firearm protected and facilitated appellant's care, custody and management of the contraband.*" *Id.*, at 942.

Although *Patterson*'s analysis is premised on the broad proposition that all felonies are susceptible to an affirmative finding, we subsequently limited *Patterson*'s expansive language in *Narron v. State*, 835 S.W.2d 642 (Tex.Cr.App.1992), and *Ex parte Petty*, 833 S.W.2d 145 (Tex.Cr.App.1992), where we acknowledged that mere possession of a firearm does not necessarily constitute its "use" as a deadly weapon for the purposes of art. 42.12, § 3g(a)(2). *See, Tyra*, 897 S.W.2d at 800–801 (Baird, J., concurring). Consequently, it is clear that *Patterson* does not establish a universal rule concerning affirmative findings in all felony offenses.

Similarly, I believe it is necessary to re-evaluate the contention that *Patterson*'s "facilitation of an associated offense" language

establishes a general framework for all cases in which the State seeks an affirmative finding. Because there is no legislative history indicating what the Legislature meant by the word "use" in the context of an affirmative finding, *Patterson*, 769 S.W.2d at 940; *and, Polk v. State*, 693 S.W.2d 391, 393 n. 1 (Tex. Cr.App.1985), we must examine the Legislature's goals in enacting art. 42.12, § 3g(a)(2). *See, Lanford v. Fourteenth Court of Appeals*, 847 S.W.2d 581, 586–587 (Tex.Cr.App.1993); *Boykin*, 818 S.W.2d at 785; *and, Patterson*, 769 S.W.2d at 940. In his concurring opinion in *Tyra*, Judge Maloney observed that "one of the primary goals behind the enactment of [art. 42.12, § 3g(a)(2) ] was to deter offenders from using guns or other deadly weapons in the commission of crimes—to encourage them to leave their weapons at home." *Id.*, 897 S.W.2d at 803 (Maloney, J., concurring). Thus, the Legislature's purpose in enacting art. 42.12, § 3g(a)(2) was to deter the use of weapons, and in particular, firearms, in the commission of crimes. *Tyra*, 897 S.W.2d at 802–803 (Maloney, J., concurring). Judge Maloney further observed the Legislature, "due largely to what may have been legislative oversight," incorporated both definitions of a deadly weapon under § 1.07. *Id.*, at 803.

A significant fact which has been overlooked in subsequent reliance upon *Patterson* is that *Patterson* addressed the conceptual tension between Patterson's mere possession of a pistol, and the affirmative finding that he "used" the pistol in connection with a drug offense. Thus, the Court was confronted with justifying an affirmative finding of the "use" of the pistol while acknowledging that Patterson never fired nor actively threatened anyone with the weapon.[8] Bearing in mind the Legislative goal behind art. 42.12, § 3g(a)(2) to deter the use of weapons in general, and firearms in particular, we explained the mere possession of a pistol constituted its use because possession of a pistol "facilitated" the possession of the drugs. In other words, Patterson's possession of a *firearm* was its "use" in the particular circumstances of the drug offense by virtue of fact that *firearms*, inherently dangerous, pose a *threat* to others, and for that reason are commonly used in the drug trade to protect the contraband. *See, id.*, 769 S.W.2d at 942.

While our "facilitation" language in *Patterson* adequately explained how mere *possession* of a firearm may constitute its "use," it is nonetheless evident that *Patterson*'s facilitation language would not support an affirmative finding where the object was not a deadly weapon *per se*.[9] Tex.Penal Code Ann. § 1.07(a)(17)(A). As we have noted in § II.B., *supra*, an object is a deadly weapon *per se* if it is inherently dangerous, in other words, if it is designed, made, or adapted to cause death or serious bodily injury. Thus, in *Patterson*, mere possession of a deadly weapon *per se* constituted "use" because of the implicit threat the weapon posed to others. However, mere possession of an object not dangerous unless actually used as a weapon, can never "facilitate the associated offense" because possession of such an object does not pose a threat to others.[10] I would hold *Patterson*'s "facilitation of an associated offense" language is limited to cases involving deadly weapons *per se*.

---

8. It should be noted that *Patterson* is contrary to federal law. In *Bailey v. U.S.*, — U.S. —, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995), the United States Supreme Court held "use" of a firearm under 18 U.S.C. § 924(c)(1), a statute similar to art. 42.12, § 3g(a)(2), requires a showing that the defendant actively employed the firearm during and in relation to the predicate crime.

9. To read *Patterson* as establishing a general framework for affirmative findings is problematic because *Patterson*'s definition of a deadly weapon to mean "*any* employment of a deadly weapon ... if [it] facilitates the associated felony" *id.*, 769 S.W.2d at 941, is unworkable outside the context in which *Patterson* was decided. In *Patterson* of course, the deadly weapon was a pistol, a deadly weapon *per se* under Penal Code § 1.07(a)(17)(A), and so it involved no conceptual stretch to support an affirmative finding. But where, the "weapon" at issue is *not* a deadly weapon *per se*, and its "use" does not comport with our common understanding of how a deadly weapon is used, application of *Patterson*'s "facilitation" language is more troublesome. If, for instance, a parent leaves an infant unattended in a bathtub and the child subsequently drowns, has the parent "used" the bathtub, or the water, to facilitate the felony offense of endangering a child? Tex.Penal Code Ann. § 22.041.

10. Neither the plurality opinion nor Judge Meyers recognize or address this distinction.

### IV.

In the instant case, the indictments charged appellants with injury to a child by omission. The State's theory of the offense was based upon appellants' failure to provide food and medical care to their son. During trial, the State presented evidence that appellants withheld food and medical attention over a number of years. As a result of appellants' failure to provide adequate nourishment or medical attention, the victim ceased growing and gradually physically deteriorated until his bodily functions failed, resulting in his death. Consequently, guilt for the charged offense was predicated solely upon appellants' failure to take affirmative steps to adequately nourish and seek medical attention for their son.

It is clear that an affirmative finding is at odds with an offense committed by omission because a prosecution for an offense based upon an omission is predicated upon proof that a defendant failed to undertake an affirmative act. *Smith v. State*, 603 S.W.2d 846, 847 (Tex.Cr.App.1980); *and*, Tex.Penal Code Ann. § 6.01(c) ("A person who omits to perform an act does not commit an offense unless a law as defined by Section 1.07 provides that the omission is an offense or otherwise provides that he has a duty to act.") *See also, Billingslea*, 780 S.W.2d at 274–275. While the State demonstrated that appellants employed various physical restraints on their son, the State did *not* prosecute appellants on the theory they committed the offense through an action, essentially, that they used the devices to prevent the victim from obtaining his own food and medical attention.

Rather, the State prosecuted appellants on the theory that they committed the offense through an omission, that is, appellants failed to take affirmative acts required of them by law as parents in the care and support of their child.

Moreover, by attempting to construe appellants' employment of restraining devices as the use of *deadly weapons* for the purposes of an affirmative finding, the State stretches art. 42.12, § 3g(a)(2) to the extreme. Although it is clear appellants "used" various devises to restrain their son, it is equally clear that those devices were not used as deadly weapons within the meaning of art. 42.12, § 3g(a)(2) and Tex.Penal Code Ann. § 1.07(a)(17)(B) because the devices were *not* used in a manner which directly caused injury to the victim. Using this reasoning, had appellants merely placed a pad lock on the refrigerator, we would be forced to conclude that the pad lock constituted a deadly weapon. However, I am unwilling to extend the meaning of "use a deadly weapon" to this extreme. Accordingly, I would hold that, as a matter of law, an affirmative finding of the use of a deadly weapon may not be made where the predicate offense is committed by omission. Because the plurality does not, I dissent.

### V.

In their third question for review, appellants contend the trial judge erred in charging the jury with the parole instructions provided by Tex.Code Crim. Proc.Ann. art. 37.07, § 4(a)[11] *and*

11. At the time of appellants trial, art. 37.07, § 4(a) provided:

In the penalty phase of the trial of a felony case in which the punishment is to be assessed by the jury rather than the court, if the offense of which the jury has found the defendant guilty is listed in Section 3g(a)(1), Article 42.12 ... *or if the judgment contains an affirmative finding under Section 3g(a)(2)*, Article 42.12 ... unless the defendant has been convicted of a capital felony the court shall charge the jury in writing as follows:

"Under the law applicable in this case, the defendant, if sentenced to a term of imprisonment, may earn time off the period of incarceration imposed through the award of good conduct time. Prison authorities may award good conduct time to a prisoner who

exhibits good behavior, diligence in carrying out prison work assignments, and attempts at rehabilitation. If a prisoner engages in misconduct, prison authorities may also take away all or part of any good conduct time earned by the prisoner.

"It is also possible that the length of time for which the defendant will be imprisoned might be reduced by an award of parole.

"Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment, he will not become eligible for parole until the actual time served equals one fourth of the sentence or 15 years, whichever is less, *without consideration of any good conduct time he may earn*. If the defendant is sentenced to a term of less than six years, he must serve at least two years before he is

(b) [12] because the submission of both instructions permitted the jury to compare lengths of sentences prior to making an affirmative finding of the use of a deadly weapon. *Appellants' Brief,* pg. 13. Although appellants contend it was proper to submit the deadly weapon issue at the punishment phase, appellants argue the trial judge should have first submitted the deadly weapon issue and then submitted an appropriate parole instruction under *either* § 4(a) *or* § 4(b) *after* the jury decided upon the deadly weapon issue. The State counters that the appropriate time to have submitted the deadly weapon issue was at the guilt-innocence phase and by requesting the deadly weapon issue be submitted at punishment, appellants have waived error. I agree.

Art. 37.07, § 4 *mandates* an instruction at the punishment phase informing the jury about the effect of good conduct time and parole eligibility on a defendant's sentence. *See, Oakley v. State,* 830 S.W.2d 107 (Tex.Cr. App.1992).[13] *See also, Marks v. State,* 830 S.W.2d 113, 114 (Tex.Cr.App.1992). Where the jury has made an affirmative finding of the use of a deadly weapon, § 4(a) informs the jury that good conduct time *is not* computed into the time a defendant must serve before he becomes eligible for parole. By contrast, where there is no affirmative finding, § 4(b) informs the jury that good conduct time *is* computed into the time a defendant must serve before he becomes eligible for parole. From a plain reading of art. 37.07, § 4, it is readily apparent that only one instruction is authorized. Therefore, in order to charge the jury with the appropriate parole instruction, the deadly weapon issue must be submitted to, and resolved by, the

> eligible for parole. Eligibility for parole does not guarantee that parole will be granted.
> "It cannot accurately be predicted how the parole law and good conduct time might be applied to this defendant if he is sentenced to a term of imprisonment, because the application of these laws will depend on decisions made by prison and parole authorities. "You may consider the existence of the parole law and good conduct time. However, you are not to consider the extent to which good conduct time may be awarded to or forfeited by this particular defendant. You are not to consider the manner in which the parole law may be applied to this particular defendant."

**12.** At the time of appellants trial, art. 37.07, § 4(b) provided in pertinent part:

> In the penalty phase of the trial of a felony case in which the punishment is to be assessed by the jury rather than the court, if the offense is punishable as a felony of the first degree, if a prior conviction has been alleged for enhancement of punishment as provided by Section 12.42(b), (c), or (d), Penal Code, or if the offense is a felony not designated as a capital felony or a felony of the first, second or third degree and the maximum term of imprisonment that may be imposed for the offense is longer than 60 years, *unless* the offense of which the jury has found the defendant guilty is listed in Section 3g(a)(1) ... or *the judgment contains an affirmative finding under Section 3g(a)(2),* ... the court shall charge the jury in writing as follows:
>
> "Under the law applicable in this case, the defendant, if sentenced to a term of imprisonment, may earn time off the period of incarceration imposed through the award of good conduct time. Prison authorities may

> award good conduct time to a prisoner who exhibits good behavior, diligence in carrying out prison work assignments, and attempts at rehabilitation. If a prisoner engages in misconduct, prison authorities may also take away all or part of any good conduct time earned by the prisoner.
> "It is also possible that the length of time for which the defendant will be imprisoned might be reduced by an award of parole. "Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment, he will not become eligible for parole until the actual time served *plus any good conduct time earned* equals one-fourth of the sentence imposed or 15 years, whichever is less. Eligibility for parole does not guarantee that parole will be granted."

\*    \*    \*    \*    \*    \*

**13.** In *Rose v. State,* 752 S.W.2d 529, 552–553 (Tex.Cr.App.1987) (Op. on Court's Mtn. for Reh'g), we held art. 37.07, § 4 violated both the separation of powers provision in art. II, § 1, and the due course of law provisions in art. I, § 13 and § 19 of the Texas Constitution.

Subsequent to our decision in *Rose,* the Legislature proposed, and the voters ratified, an amendment to Tex. Const. art. IV, § 11 which granted the Legislature the authority to authorize our trial judges to inform juries on the effect of good time and parole. *See,* Acts 1989, 71st Leg., S.J.R. 4, § 1, approved by voters on November 7, 1989. We upheld the constitutionality of the parole instruction in *Oakley v. State,* 830 S.W.2d 107 (Tex.Cr.App.1992). *See also, Bruno v. State,* 845 S.W.2d 910, 913 (Tex.Cr.App.1993); *French v. State,* 830 S.W.2d 607, 608 (Tex.Cr.App.1992); *Marks v. State,* 830 S.W.2d 113, 114 (Tex.Cr.App. 1992).

jury prior to the instruction mandated by art. 37.07, § 4.

Although art. 37.07, § 4 specifically mandates a parole instruction at the punishment phase, our statutes are silent as to when a deadly weapon issue is to be submitted. Further, our discussion of this issue consists of dicta. In *Polk v. State*, 693 S.W.2d 391 (Tex.Cr.App.1985), we explained in a footnote that "[w]hile not mandating that the [deadly weapon] issue be submitted at the punishment phase of the trial, Art. 37.07, § 1(a) seems to indicate that this is the better practice." *Id.*, at 394, n. 3. *See also, Fann v. State*, 702 S.W.2d 602, 604–605 (Tex.Cr.App. 1985) (Op. on Mtn. for Reh'g) ("An affirmative finding can be and is perhaps more suited to be a punishment issue.") In *Murphy v. State*, 777 S.W.2d 44 (Tex.Cr.App. 1988) (Op. on Reh'g), however, we stated that "where the jury's verdict does not already constitute an affirmative finding of use or exhibition of a deadly weapon ... *and the issue has not been otherwise submitted at the guilt phase of trial*, that fact must also be proven at the punishment phase for the State to reap the benefit of Article 42.12, § 3g(a)(2) or Article 42.18, § 8(b), V.A.C.C.P." *Id.*, 777 S.W.2d at 62, n. 10. Finally, in *Luken v. State*, 780 S.W.2d 264 (Tex.Cr.App.1989), the defendant challenged the trial court's submission of a deadly weapon issue at the guilt-innocence phase. While declining to decide the ultimate issue of whether it was error to submit a deadly weapon issue at the guilt-innocence phase, we nevertheless stated:

> ... We have never said the issue of deadly weapon must be resolved at the punishment phase.... The Court's holding in *Polk v. State* ... *viz* that under certain circumstances a verdict of "guilty as charged in the indictment" at the end of the guilt stage of trial will constitute an affirmative finding, clearly militates against that conclusion.

*Luken*, 780 S.W.2d at 268.

*Polk, Murphy* and *Luken* were decided prior to the voter's ratification of the constitutional amendment authorizing art. 37.07, § 4. Thus, when those cases were decided, a parole instruction at the punishment phase was not only *not* necessary, it was unconstitutional. *See, Rose v. State*, 752 S.W.2d 529, 552–553 (Tex.Cr.App.1987) (Op. on Court's Mtn. for Reh'g). Although *Polk, Murphy,* and *Luken* made clear that there was no prohibition against the submission of a deadly weapon issue at the guilt-innocence phase, in light of art. 37.07, § 4's requirement of a single parole instruction at punishment, it is now apparent that the deadly weapon issue *must* be submitted at the guilt-innocence phase in order for the trial judge to submit the proper parole instruction. While appellants seek to have the punishment deliberations divided into two stages, in which the deadly weapon issue be submitted and resolved first, and then the parole instruction and sentence, this contention is belied by the Legislature's statutory creation of a bifurcated criminal trial. *See,* art. 37.07, § 2; *and, Brown v. State*, 617 S.W.2d 234, 235 (Tex.Cr. App.1981). In enacting a bifurcated trial system, the Legislature provided for only two phases of trial as well as an accompanying stage for jury deliberation after each phase. Appellants' argument for subdividing the punishment phase into two distinct stages for deliberation is not supported by art. 37.07. Accordingly, when an affirmative finding of the use of a deadly weapon is sought, the appropriate time to submit the issue is at the guilt-innocence phase.

Consequently, I would find the trial judge erred in submitting the deadly weapon issue at the punishment phase. However, the trial judge did so at appellants' request. The record indicates the State sought to submit the deadly weapon issue at the guilt-innocence phase but appellants objected, contending that if the issue was to be submitted at all, it was most appropriately submitted at the punishment phase. By requesting the deadly weapon issue be submitted at the punishment phase, appellants invited the error. As we explained in *Tucker v. State*, 771 S.W.2d 523 (Tex.Cr.App.1988):

> ... It is well established that when a defendant requests a charge, and the court submits it, he cannot complain of that charge on appeal.... Even if the charge is later found to be erroneous, the accused can not first invite error, and then complain about it on appeal.

*Tucker,* 771 S.W.2d at 534 (citations omitted). *See also, Capistran v. State,* 759 S.W.2d 121, 124 (Tex.Cr.App.1982) (Op. on Mtn. for Reh'g). Therefore, appellants are estopped from subsequently complaining of the jury charge on appeal. *State v. Yount,* 853 S.W.2d 6, 9 (Tex.Cr.App.1993); *and, State v. Lee,* 818 S.W.2d 778, 781 (Tex.Cr.App.1991). Consequently, I concur in the result reached by the plurality concerning appellants' third question for review.

MALONEY and MEYERS, JJ., join only part V of this opinion.