Barbara Catherine ATKINSON,
Appellant,

v.

The STATE of Texas, Appellee.

No. 05–02–00178–CR.

Court of Appeals of Texas,
Dallas.

June 17, 2003.

Allan Fishburn, Dallas, for Appellant.

William T. (Bill) Hill, Jr., Anne Wetherholt, Asst. Dist. Atty., Dallas, for State.

Before Justices BRIDGES, O'NEILL, and FITZGERALD.

## OPINION

Opinion By Justice BRIDGES.

Barbara Catherine Atkinson appeals her injury to a child conviction. The jury found appellant guilty and assessed punishment at life confinement. In four points of error, appellant argues the trial court erred in submitting a deadly weapon issue to the jury, sustaining the State's objection to certain expert testimony, and instructing the jury regarding the availability of good conduct time. Appellant also argues the charge on good conduct time is unconstitutional as applied to her. We affirm the trial court's judgment.

The record shows that, on June 11, 2001, Jeannie Rivers went to appellant's mobile home to use the telephone. Rivers was appellant's neighbor, and her children and appellant's children played together. Appellant was not home, but her husband, Kenneth Atkinson, let Rivers into the home and led her to a back room. Atkinson opened the bedroom door, moved a box or basket from in front of a closet door, removed some hanging clothes, and told Rivers he was going to show her "Barbie's secret." Atkinson opened the closet door and showed her the complainant, L.C.

Rivers described what she saw as follows:

Okay. I feel guilty saying this. I feel bad saying it, but what I pictured was a monster, a little bitty monster. And it was horrible, and I feel bad that I say that, but she was so frail and without color. Her arms, they appeared to be no bigger than an inch wide to me. She was naked. She had a towel or a blanket that was real small wrapped around her, the back of her rear and her legs. And she was kind of sitting with her legs up to her chest, but she wasn't holding her legs. She was giving herself leverage, and I could tell she had nothing covering her. And her privates were showing, and she had one eye that was partially open. I believe it was her right eye. And then her left eye was completely closed with yellowish and green goo coming out of her eyes. And her hair was all matted to one side. And all I saw was dark shadows behind her, and she just looked up at me and didn't say a word.

Rivers testified the closet smelled like feces and strong urine. Rivers asked Atkinson several questions about L.C. and began crying. Atkinson hugged Rivers, and Atkinson put the hanging clothes and the box back in front of the closet door. Some of the older children came in the house and asked why Rivers was crying. Rivers said she had been on the telephone with her mother. Rivers' husband came to the house and took Atkinson to get some cigarettes. When her husband returned, Rivers went home with him and told him

about L.C. Immediately, Rivers' husband left and reported the situation to the police. Police and paramedics arrived on the scene, and L.C. was taken to the emergency room.

Suzanne Scott, attending physician at Children's Medical Center in Dallas, examined L.C. the next morning. Although L.C. was eight years old, she weighed twenty-two pounds and was thirty-six inches tall. L.C. had difficulty sitting up and could not stand. She had sunken eyes, hollowed cheeks, poor dentition, several teeth missing, a distended abdomen, and she was "very very thin and emaciated" and obviously malnourished. Over the next week to ten days, L.C. had to be closely monitored as the "refeeding" process began. Scott testified that L.C. could have died if she had been "refed" in an unsupervised area. In fact, even though she was under constant supervision, L.C. experienced several episodes where her condition became unstable, her blood pressure dropped, and her heart rate was exceedingly high. At one point, L.C. went into respiratory distress and was in shock for several hours. When asked how long it would have taken for L.C. to get in her condition, Scott testified L.C.'s height and weight were in the fiftieth percentile for a two-year-old, and her growth stopped when she reached that height and weight. At the close of the evidence, the jury found appellant guilty and assessed punishment at life confinement. This appeal followed.

 In her first point of error, appellant argues the trial court erred by submitting a deadly weapon issue to the jury. Although the indictment did not allege the use of a deadly weapon, the State filed a pretrial notice of intent to seek deadly weapon finding providing that appellant used or exhibited "a lock, a door, a closet, and a dresser either individually or in combination." Specifically, appellant complains she was charged with a crime of omission, and a deadly weapon finding is only authorized when a crime of *commission* is charged. This argument has been made previously and rejected in *Hill v. State,* 913 S.W.2d 581, 583 (Tex.Crim.App. 1996). In *Hill,* husband and wife appellants used chains, belts, and locks to restrain their son, who eventually died of starvation. *Id.* at 582. The jury found appellants guilty of injury to a child and further found appellants used a deadly weapon in the commission of the offense. *Id.* The court of criminal appeals held that, in using chains, belts, and locks to restrain their son and deprive him of food, the appellants committed an affirmative, conscious, and intentional act. *Id.* at 583. Similarly, in this case appellant committed an affirmative, conscious, and intentional act when she placed her daughter in a closet and locked her inside. *See id.* In addition, Scott testified L.C. could have died if she had been treated for her injuries without supervision. Under these circumstances, we cannot conclude the trial court erred in submitting a deadly weapon issue to the jury. We overrule appellant's first point of error.

In her second point of error, appellant argues the trial court erred in sustaining the State's objection at punishment that appellant had not established the reliability of the opinions of appellant's psychiatric expert under rule of evidence 702.[1] Specifically, appellant complains she was prevented from presenting the testimony

1. Rule of evidence 702 provides:
 If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.
 TEX.R. EVID. 702.

of psychiatrist Jaye Crowder regarding appellant's post-traumatic disorder, IQ, "genetic endowment," history of being sexually abused, and whether appellant's experiences resulted in her actions toward L.C. At the close of a hearing outside the presence of the jury, the trial court stated that Crowder's opinions on those matters were not shown by clear and convincing evidence to be reliable and sustained the State's objection to those opinions.

■ Nevertheless, we need not decide whether the trial court erred in sustaining the State's objections to Crowder's testimony because Crowder subsequently testified in front of the jury that he had examined appellant and concluded she suffered from depression and substance abuse and had a borderline personality disorder with antisocial features. According to Crowder, in school appellant was placed in remedial math and English courses, which some people referred to as "special education." Appellant's mother, Fredericka McCog, was a prostitute, a schizophrenic, and a "very unstable individual." Crowder testified that appellant's "hereditary temperament" might have some relationship to her personality disorders.

When asked whether the events of appellant's early childhood led to "shortsighted" thinking and the behavior appellant exhibited toward L.C., Crowder responded that "[i]t had to contribute. There's certainly what we call a cycle of abuse." At this point in Crowder's testimony, the State objected, and the trial court sustained the objection. However, the State did not ask for or receive an instruction to disregard Crowder's testimony. Crowder also testified that appellant felt the sex with L.C.'s father was "not really consensual because [appellant] was drinking at the party where she met him. He held on to her, wouldn't let her go, according to her perception, anyway, and she finally gave in to sex."

■ Exclusions of evidence are unconstitutional only if they "significantly undermine fundamental elements of the accused's defense." *Potier v. State,* 68 S.W.3d 657, 666 (Tex.Crim.App.2002) (quoting *United States v. Scheffer,* 523 U.S. 303, 315, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998)). "That [the defendant] was unable to ... present his case to the extent and in the form he desired is not prejudicial where, as here, he was not prevented from presenting the substance of his defense to the jury." *Potier,* 68 S.W.3d at 666 (quoting *United States v. Willie,* 941 F.2d 1384, 1398–99 (10th Cir. 1991), *cert. denied,* 502 U.S. 1106, 112 S.Ct. 1200, 117 L.Ed.2d 440 (1992)). Because, in this case, appellant was not prevented from presenting the substance of her defense to the jury during Crowder's testimony, we conclude the trial court's action in initially sustaining the State's objection did not significantly undermine fundamental elements of appellant's defense. *See Potier,* 68 S.W.3d at 666. Further, appellant has not specified what additional evidence she was prevented from introducing. We overrule appellant's second point of error.

■ In her third and fourth points of error, appellant argues the trial court erred in instructing the jury regarding the availability of good conduct time, and section 4(a) of article 37.07 of the code of criminal procedure, which requires a good conduct time instruction, is unconstitutional as applied to her. *See* TEX.CODE CRIM. PROC. ANN. art. 37.07, § 4(a) (Vernon Supp. 2003). As appellant points out, a defendant convicted of injury to a child is not eligible to receive good conduct time while incarcerated. TEX. GOV'T CODE ANN. § 508.149(a)(9) (Vernon Supp.2003). However, appellant failed to object to the jury charge at trial. Where a defendant fails to object to a jury charge on a constitutional

violation basis, she waives the heightened harm analysis provided for reviewing constitutional errors. *See Jimenez v. State,* 32 S.W.3d 233, 237–38 (Tex.Crim.App. 2000). Because she failed to preserve jury charge error, we may reverse only if the record demonstrates she suffered egregious harm. *See id; Almanza v. State,* 686 S.W.2d 157, 171 (Tex.Crim.App.1985) (op. on reh'g). In determining the degree of harm suffered, we look to the entire jury charge, the evidence, including contested and probative evidence, counsel's arguments, and any other relevant information. *See Almanza,* 686 S.W.2d at 171.

The jury charge in this case specifically instructed the jurors that, although a defendant may earn good conduct time, it could not be predicted how it might apply to appellant; therefore, the jurors were not to consider how good conduct time might affect appellant's sentence. *See Cagle v. State,* 23 S.W.3d 590, 594 (Tex.App.-Fort Worth 2000, pet. ref'd). Without evidence to the contrary, we may assume the jury was not confused or misled by the charge and did not consider the possibility of good conduct time when assessing appellant's punishment. *See Williams v. State,* 937 S.W.2d 479, 490 (Tex.Crim.App. 1996). Good conduct time was not mentioned by either the State or appellant during closing arguments. Under these circumstances, we cannot conclude that appellant suffered egregious harm. *See Jimenez,* 32 S.W.3d at 237–38; *Almanza,* 686 S.W.2d at 171. Further, the good conduct time instruction did not violate appellant's right to due process. *See Luquis v. State,* 72 S.W.3d 355, 368 (Tex.Crim.App.2002). We overrule appellant's third and fourth points of error.

We affirm the trial court's judgment.