Opinion issued March 13, 2008

 













In The

Court of Appeals

For The

First District of Texas






NO. 01-04-01210-CR






DAMACIA DANIELLE BUSBY, Appellant


V.


THE STATE OF TEXAS, Appellee






On Appeal from the 185th District Court

Harris County, Texas

Trial Court Cause No. 978120






MEMORANDUM OPINION

 A jury convicted appellant, Damacia Danielle Busby, of injury to a child, found
a deadly weapon special issue true, and assessed punishment at 30 years'
confinement. On appeal, appellant contends that (1) his confession was involuntary,
and (2) the evidence is legally and factually insufficient. We affirm.

BACKGROUND

 On February 19, 2004, Latasha Howard woke her young sons, got them ready
for school, and took them to meet the school bus. She then woke appellant, her
boyfriend, so that he could get ready for a traffic court appearance. Next, Latasha
got her four-year-old daughter, Julia, ready for her first day of preschool. Latasha's
cousin, Felicity Howard, soon arrived to drive Latasha and Julia to the school. 
Latasha's four-month-old son, Jeremiah Davis, went with them.

 After registering Julia at school, Latasha and Felicity stopped for breakfast at
McDonald's. Felicity then took Latasha and Jeremiah home. Latasha visited with
neighbors outside her apartment for about an hour before returning to her apartment
with Bevery Hutch, her upstairs neighbor and frequent babysitter.

 From 10:00 a.m. to 1:30 p.m., Latasha and Beverly visited and watched
television. During this time, Jeremiah was in a happy mood. He had a bottle of
formula and was laughing and "cooing" with Beverly.

 At 12:30 p.m., appellant called Latasha from a car lot where he was looking at
cars. He asked Latasha to call his workplace and report that he was still in court and
would not be in to work. Beverly soon left Latasha's apartment, and appellant
returned.

 Latasha's sister, Vickie Battles, came over. Latasha and Vickie walked to the
apartment office, and then visited outside until around 2:30 p.m. During the time
Vickie was with Latasha, Jeremiah was awake, happy, and comfortable.

 After Vickie left, Latasha realized that it was 2:30 p.m. and that she was late
picking Julia up from school. She picked up Jeremiah and his car seat, but then
decided to ask appellant to watch Jeremiah because she was running late. Appellant
told her to take the baby with her. Latasha persisted, explaining that if she had to take
Jeremiah she was going to be even later picking up Julia. Appellant said, "It's fine,
you can leave him with me, but if he cry, I'm not going to pick him up." Latasha put
Jeremiah in a stroller and gave him a bottle. When she left, he was taking his bottle
and was not crying.

 Latasha stopped to get gas and then picked up Julia and Felicia's son, Calvin,
from preschool. She then dropped Calvin off at Felicia's house and went home. She
had been away from home for 30 minutes. As she drove up, she saw appellant
walking toward the car. Appellant told Latasha, "You have to come on, something
wrong with Jeremiah." When she entered the apartment, Latasha did not hear
Jeremiah crying. Instead, he was lying still on her bed. She put her hand on
Jeremiah's stomach and discovered that he was not breathing. Latasha asked
appellant if he had called for help and he said, "No." She then told him to find the
telephone, while she began performing C.P.R. on Jeremiah. Appellant called 9-1-1.

 After paramedics arrived, they asked who was with Jeremiah. Latasha told
them that she was the baby's mother, but that she did not know what had happened
to him. Appellant told them that he was the person who was with the baby. While
the EMTs were there, appellant told Latasha, "I told you don't leave Jeremiah here
with me. Now these people going to think I did something to Jeremiah."

 Latasha rode with Jeremiah to the hospital. Appellant followed in his own car. 
Once at the hospital, Latasha was taken to a nearby room to wait while the doctors
worked on Jeremiah. A nurse came and told Latasha that "the baby's father" was
there and wanted to speak to her. Latasha explained that appellant was not Jeremiah's
father, and that she did not want to speak to him.

 Appellant waited in the family room at the hospital, where he was interviewed
by Sergeant M. Peters. Officer F. Gans interviewed Latasha at the same time. After
discovering that appellant was the only person with Jeremiah before the ambulance
was called, the officers felt that they needed to further question appellant, and they
asked if he would come to the police station. The officers told appellant that he did
not have to come to the police station, but appellant agreed, so Peters drove appellant
downtown to the police station. Once there, the officers took appellant to an
interview room and read him his statutory rights. Appellant agreed to talk to the
officers and never indicated to them that he wanted to return to the hospital.

 Appellant told the police that he did not want to keep the baby that day because
he thought the baby would be too fussy. After Latasha left, the baby started crying
and would not stop. Appellant did not know what was wrong. Appellant picked up
Jeremiah and realized that he was sweating, so appellant took off the baby's clothes
and began to rock him and pat him. Appellant noticed that the baby's hair smelled 
sour, so he started to wash the baby's hair in the sink. While doing so, some water
got in the baby's nose and he started choking. Appellant patted the baby on the back
to clear his throat, and then Latasha arrived and they called 9-1-1. Gans asked
appellant if he understood what happens when a person shakes a baby. He also asked
appellant whether he shook Jeremiah. Appellant responded that he knew you were
not supposed to shake a baby too hard, and that he had only "bounced [Jeremiah]
lightly."

 After giving this initial statement, Peters and Gans left the interview room and
discussed the information appellant had given them. They agreed that appellant was
not telling the truth and that he should be interrogated further. Gans returned to the
interview room, while Peters waited outside. Gans told appellant that he did not
believe what appellant had told him. Gans told appellant that he believed that, once
the baby started crying, appellant "lost it" and started shaking the baby. After telling
appellant what he thought had happened, Gans placed a blank, voluntary statement
form on the table in front of appellant and asked him, "Do you want to tell the truth
about what really happened?" Appellant nodded his head and said, "Yes." The form
had appellant's statutory rights written on it, which Gans had appellant read aloud
and initial. Appellant then wrote the following statement:

 I Damacia Busby were at home with Jeremiah Davis on 2/19/04. 
Jeremiah were left with me by Latasha Howard his mother so that she
could go get our daughter Julia Davis. First, before she left Jeremiah
was crying. She asked me could he stay with me till she run and go pick
Julia up, I replied that him with you he's already cranky. Latasha
responded she would be right back. I said ok. Latasha gave him a bottle
and he stopped crying. While she was gone he started back crying. I
Damacia Busby then went and made him another bottle. Jeremiah
sucked the bottle for a few minutes. Jeremiah started crying again. I
then did not know what was wrong with him. All I could think was that
he wanted to be held or changed. So I picked him up out of his stroller. 
Next I discovered he was hot so I took his clothes off. Then I changed
his pamper and tried to cool him off. Jeremiah kept crying I didn't know
what to do. So I rocked him, patted him. Nothing was working. I was
hoping Tasha walked in any minute. She didn't, I did not know what
was the problem so I shook him briefly. I did not try to I was just
nervous and did not know what was wrong with my baby. I love
Jeremiah with all my heart. I was just trying to be the perfect father. I
never had a father around so I tried to be better. After I shook Jeremiah
he looked kind of woosy. So I gave him his bottle and he threw up. I
tried to wash his hair. He slipped out of my arms for a brief moment and
started to chock [sic]. I batted him on his back he started throwing up
like milk. Jeremiah had a strange look on his face so I did not know
what to do. I tried C.P.R. I heard my car pulling up so I ran and got
Tasha. She was screaming help and I was trying to help to do C.P.R.
and call 911. So when the ambulance got there I ran out to the truck
with the baby.


 Peters and another officer then came back into the interview room to witness
appellant sign his statement. The officers asked appellant several questions about
whether he was threatened or coerced into giving his statement. Appellant said that
he was not and signed the statement in the presence of all three officers. Gans also
recorded appellant reading the statement aloud, including the statutory warnings. 

 After obtaining appellant's written statement, Gans called the district attorney
and asked for charges to be accepted against appellant. Appellant was then arrested
and transported to the city jail. 

 Jeremiah remained on life support at the hospital for three days. When a test
showed no brain activity, Latasha agreed to remove Jeremiah from life support and
he died soon thereafter.

VOLUNTARINESS OF CONFESSION

 In his first point of error, appellant contends his confession was involuntary 
and the trial court erred by admitting it into evidence. Specifically, appellant
contends that "he was compelled to make a statement after indicating to the officer
that he wished to know the health and medical status of the child and after not being
provided any critical updates as he was held in a locked and secured room at the
hospital." 

 When a defendant makes a pretrial challenge to the voluntariness and
admissibility of his confession, the prosecution bears the burden of proving
voluntariness by a preponderance of the evidence. Lego v. Twomey, 404 U.S. 477,
489, 92 S. Ct. 619, 627 (1972); Alvarado v. State, 912 S.W.2d 199, 211 (Tex. Crim.
App. 1995). The court, outside the presence of the jury, must conduct a hearing to
determine whether the statement was voluntarily given. Tex. Code Crim. Proc.
Ann. art. 38.22 section 6 (Vernon 2005); see Jackson v. Denno, 378 U.S. 368, 84
S.Ct. 1774 (1964) (establishing procedure for voluntariness hearing). Voluntariness
is determined by considering the totality of the circumstances. Creager v. State, 952
S.W.2d 852, 855 (Tex. Crim. App. 1997). We do not disturb the trial court's ruling
unless there was a clear abuse of discretion. Alvarado, 912 S.W.2d at 211. When,
as here, the determination revolves around historical facts and witness credibility, we
give the court almost total deference. State v. Ross, 32 S.W.3d 853, 856 (Tex. Crim.
App. 2000) (citing Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)).

 Because appellant argued that his statement was involuntary, the trial court
held a hearing outside the presence of the jury to determine whether the statement was
voluntarily given. Sergeant Peters and Officer Gans testified for the State and
appellant testified on his own behalf. At the hearing, the trial court heard two
different versions of the events leading up to appellant's written statement.

 Appellant testified that Sergeant Peters approached him at the hospital and took
him into a locked room for questioning. In contrast, Peters testified that appellant had
been put in the room by hospital personnel, and that Peters had to get someone to
unlock the door to let him in. Gans testified that the doors were locked from the
outside, but that they opened from the inside. Appellant testified that he never made
any attempt or request to leave the room.

 Appellant spoke with Peters at the hospital for less than five minutes. Gans
and Peters then requested that appellant come to the police station to answer more
questions. Appellant testified that he was never told that he had the right to refuse
to come to the station. This, however, is contradicted by Gan's testimony that he
specifically told appellant that he did not have to go to the police station.

 Peters drove appellant and Gans to the police station. Appellant was not under
arrest and was not handcuffed. He rode in the backseat with Gans while Peters drove. 
The officers offered to stop and buy appellant some food, but he refused.

 Once at the station, appellant was escorted to an interview room on the 6th
floor. The officers testified that they immediately read appellant his statutory
warnings from a "blue card." Appellant, however, testified that the officers were
lying and that they never read him his rights.

 During the initial questioning, appellant told the officers a version of the events
that they did not believe. Appellant admitted to "bouncing" the baby and washing the
baby's hair to get a sour smell off him, during which water caused the baby to begin
choking. Appellant, however, did not mention shaking the baby. The officers then
left appellant in the room and went outside to discuss their next move. They agreed
that Gans would return and accuse appellant of shaking the baby to see how appellant
responded.

 Gans testified that he returned to the room and told appellant that he believed
that appellant had shaken the baby to stop the baby from crying. He explained that
retinal hemorrhaging would show if the baby had been shaken and that there were
very few things that would cause retinal hemorrhaging. Appellant testified that he
tried to tell Gans that he wanted to leave and go back to the hospital to check on the
baby, but that Gans would put up his hand and stop appellant from talking. Gans
admitted that he cut off appellant several times when he tried to interrupt Gans's
accusations, but Gans testified that he did so because appellant had not yet been given
his statutory warnings again. Gans further testified that once he stopped talking,
appellant had ample opportunity to end the questioning, but never made such a
request.

 Gans testified that after he accused appellant of shaking the baby, he asked
appellant if he was ready to tell the truth. Appellant said yes, and Gans placed a
voluntary statement form in front of him. Gans testified that he had appellant read
each of his statutory warnings, including one that stated, "I have the right to terminate
this interview at any time." Appellant read and initialed his statutory rights, then
wrote out his written statement, in which he mentioned for the first time that he shook
the baby.

 Appellant testified that everything in the written statement was true, except the
statement that he shook Jeremiah. He testified that he felt that he had to include that
in the statement because Gans had told him that if he did not, they were going to
come after him "with a hard ball." Appellant testified that he gave the statement so
that he could go back to the hospital to check on Jeremiah. Appellant testified that
he told the officers that his statement was not true, but he was told that if he wrote it
then "they would not come down on [him] with hard ball." In contrast, Gans testified
that he encouraged appellant to show some remorse and write a statement, but he
denied telling appellant what to put in the statement. 

 After appellant finished writing his statement, Peters and another officer came
in the room and Peters asked appellant questions about whether the statement was
made voluntarily. Appellant replied that it was and then signed the statement in the
presence of the officers. Appellant then read his statement aloud, while the officers
recorded it on an audiotape. At the end of the tape, Officer Gans asked appellant if
the statement was voluntary, and appellant replied that it was.

 Appellant concluded his testimony at the hearing by stating that he was coerced
into giving the statement because he wanted to go back to the hospital and because
he thought the police would go easier on him if he gave the statement. However, he
admits that he never asked the police to stop the interview and to take him back to the
hospital. Officer Gans denied ever telling appellant that if he did not say he shook
the baby they "would come at him with a hard ball."

 In light of the conflicting testimony given at the hearing, the trial court was
entitled to believe the officers and disbelieve appellant. As such, the trial court's
denial of appellant's motion to suppress his written statement was not an abuse of
discretion.

 Accordingly, we overrule point of error one.

SUFFICIENCY OF THE EVIDENCE

 In points of error two and three, appellant contends the evidence was legally
and factually insufficient to prove that he intentionally and knowingly caused injury
to a child. A person commits injury to a child if he unlawfully, intentionally or
knowingly causes serious bodily injury to a child younger than 14 years of age. Tex.
Pen. Code Ann. § 22.04(a)(1); 22.04 (c)(1) (Vernon Supp. 2007). Serious bodily
injury means bodily injury that creates a substantial risk of death or that causes death. 
Tex. Pen. Code Ann. § 1.07(46) (Vernon Supp. 2007).

 We review the legal sufficiency of the evidence by viewing the evidence in the
light most favorable to the verdict to determine whether any rational trier of fact
could have found the essential elements of the offense beyond a reasonable doubt.
Vodochodsky v. State, 158 S.W.3d 502, 509 (Tex. Crim. App. 2005). We note that
the trier of fact is the sole judge of the weight and credibility of the evidence.
Margraves v. State, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000). Thus, when
performing a legal sufficiency review, we may not reevaluate the weight and
credibility of the evidence and substitute our judgment for that of the fact-finder.
Dewberry v. State, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). We must resolve any
inconsistencies in the evidence in favor of the verdict. Curry v. State, 30 S.W.3d 394,
406 (Tex. Crim. App. 2000).
 In a factual sufficiency review, we view all the evidence in a neutral light, both
for and against the finding, and set aside the verdict if the proof of guilt is so
obviously weak as to undermine confidence in the jury's determination, i.e., that the
verdict seems "clearly wrong and manifestly unjust," or the proof of guilt, although
legally sufficient, is nevertheless against the great weight and preponderance of the
evidence. Watson v. State, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006). A jury
is in the best position to evaluate the credibility of witnesses, and we are required to
give "due deference" to the jury's determinations. Marshall v. State, 210 S.W.3d
618, 625 (Tex. Crim. App. 2006).

Legal Sufficiency

 The evidence, viewed in the light most favorable to the verdict, shows that
Jeremiah died as a result of blunt force head injuries. Doctors Ada Earp and Morna
Gonsoulin testified regarding Jeremiah's injuries. Horizontal, linear marks on
Jeremiah's body appeared to have been caused by separated fingers "squeezing" him. 
Retinal hemorrhages, which would have been caused by having been violently
shaken, covered 90% of Jeremiah's retinas. He also suffered an extensive
subarachnoid hemorrhage, consistent with trauma to the head, such as being slammed
or thrown on a table or wall. There was an abrasion and contusion to Jeremiah's
scalp in a "V" band-like pattern, which was consistent with his head being struck
against an object with a corner. Jeremiah also suffered a subdural hemorrhage, which
can be caused by a rapid acceleration and deceleration of the head, such as shaking.

 The evidence showed that appellant was the only person with Jeremiah at the
time he fell ill. There was testimony that the injuries that Jeremiah suffered would
have caused him to lose consciousness immediately. After suffering the injuries,
Jeremiah would not have been able to laugh, smile, cry, or suck a bottle. The
evidence shows that, when he was left in appellant's care, he was able to interact,
laugh and smile. In fact, Jeremiah was drinking a bottle when Latasha left him with
appellant. Appellant admitted that he "shook" Jeremiah and that after he did so,
Jeremiah looked "woosy."

 Viewing this evidence in a light most favorable to the verdict, a rational jury
could have found beyond a reasonable doubt that appellant caused Jeremiah's serious
bodily injuries. 

Factual Sufficiency

 Appellant argues that the evidence is factually insufficient because there was
no evidence that he was entirely alone with the child throughout the day, and that
other people had access to the child during the day.

 Appellant correctly points out that Jeremiah was not in his care for most of the
day. The evidence shows that during the day, Jeremiah was in the presence of
Latasha, Felicity, Beverly, and Vickie during various times of the day. However, the
evidence also shows that, during those times, Jeremiah was responsive and healthy. 
Jeremiah did not show signs of injury until after he had been alone with appellant. 
Doctors Earp and Gonsoulin testified that the extent of Jeremiah's injuries would
have caused him to lose consciousness immediately. 

 Viewing all the evidence in a neutral light, it is not so obviously weak as to
undermine confidence in the jury's determination, nor is the verdict against the great
weight and preponderance of the evidence. Watson v. State, 204 S.W.3d at 414-15.

Deadly Weapon

 In points of error two and four, appellant argues that there is legally insufficient
evidence to show that he used a deadly weapon. When the State alleges the use of a
deadly weapon that is not deadly per se, as here, the State must prove beyond a
reasonable doubt that the weapon was used in a manner capable of causing death or
serious bodily injury. Hill v. State, 913 S.W.2d 581, 583-844 (Tex. Crim. App.
1996). Texas Penal Code Section 1.07(a)(17)(B) provides, in relevant part, that a
"deadly weapon" is "anything that in the manner of its use or intended use is capable
of causing death or serious bodily injury." Tex. Pen. Code Ann. § 1.07(a)(17)(B)
(Vernon Supp. 2007). Texas Penal Code Section 1.07(a)(46) provides that " 'serious
bodily injury' means bodily injury that creates a substantial risk of death or that
causes death, serious permanent disfigurement, or protracted loss or impairment of
the function of any bodily member or organ." Tex. Pen. Code Ann. § 1.07(a)(46)
(Vernon Supp. 2007).

 The Court of Criminal Appeals has recognized that a hand may be a deadly
weapon within the meaning of section 1.07(a)(17), "depending upon the evidence
shown." Turner v. State, 664 S.W.2d 86, 90 (Tex. Crim. App. 1983). To determine
whether something is a deadly weapon, the jury may consider all the surrounding
facts, including the defendant's words. Blain v. State, 647 S.W.2d 293, 294 (Tex.
Crim. App. 1983). The State needed to prove only that appellant's hands were
capable of causing serious bodily injury in the way that they were used or intended
to be used. See Hill, 913 S.W.2d at 584.

 Viewed in the light most favorable to the verdict, the evidence presented at trial
established that Jeremiah's head injuries were caused by violent shaking. In this case,
Jeremiah had marks on his body that indicated that he had been "squeezed." He also
had severe retinal hemorrhaging, which is consistent with shaken baby syndrome. 
The hemorrhages would have been caused by being violently shaken, causing the
head to go back and forth, injuring the brain, and causing the blood vessels in the
retina to tear and bleed. The evidence also showed that Jeremiah had been struck
with a blunt object such as a wall or table. These injuries would have immediately
caused Jeremiah to lose consciousness, and the child showed signs of injury only after
he had been alone with appellant. Appellant admitted shaking Jeremiah.

 From this evidence, the jury could have rationally concluded that appellant's
hands, in the manner used, were capable of inflicting serious bodily injury to
Jeremiah. See Villanueva v. State, 194 S.W.3d 146, 159 (Tex. App.--Houston [1st
Dist.] 2006, no pet.) (holding evidence sufficient to support deadly weapon finding
when evidence showed that defendant used his hands to shake child, causing head
injuries); Morales v. State, 792 S.W.2d 789, 790-91 (Tex. App.--Houston [1st Dist.]
1990, no pet.) (holding evidence sufficient to support deadly-weapon finding when
evidence showed that defendant used his hands to suffocate victim). We hold that the
evidence was legally sufficient to show that appellant used a deadly weapon during
the commission of the offense alleged.

 We overrule points of error two, three, and four.

REFORMATION OF JUDGMENT

 We note that, even though the jury answered the special issue regarding use of
a deadly weapon to be true, the trial court did not enter an affirmative finding of such
in the judgment. Instead, the trial court marked "n/a."

 "An appellate court has the power to correct and reform a trial court judgment
'to make the record speak the truth when it has the necessary data and information to
do so. . . .'" Nolan v. State, 39 S.W.3d 697, 698 (Tex. App.--Houston [1st Dist.]
2001, no pet.) (citing Asberry v. State, 813 S.W.2d 526, 529-31 (Tex. App.--Dallas
1991, pet. ref'd)); see Tex. R. App. P. 43.2(b). This power includes adding a deadly
weapon finding to a judgment that erroneously omitted a factfinder's deadly weapon
finding and deleting a deadly weapon finding that was erroneously entered in the
judgment without a factfinder's first having made the finding. See French v. State,
830 S.W.2d 607, 609 (Tex. Crim. App. 1992) (adopting Asberry's reasoning to add
such finding); Ex parte Nino, 659 S.W.2d 436, 437 (Tex. Crim. App. 1983) (deleting
finding); Polk v. State, 693 S.W.2d 391, 395-96 (Tex. Crim. App. 1985) (deleting
finding); Cobb v. State, 95 S.W.3d 664, 668 (Tex. App.--Houston [1st Dist.] 2002,
no pet.) (adding finding); Asberry, 813 S.W.2d at 529 (adding finding).

 Accordingly, we reform the judgment to include an affirmative deadly weapon
finding.

CONCLUSION

 The judgment of the trial court, as hereinabove reformed to include a deadly
weapon finding, is affirmed.


 Sherry Radack

 Chief Justice


Panel consists of Chief Justice Radack and Justices Jennings and Bland.


Do not publish. Tex. R. App. P. 47.2(b).