**AFFIRMED as MODIFIED and Opinion Filed June 16, 2023**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-21-00847-CR**

**ROBERT DIXON, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court No. 4**
**Dallas County, Texas**
**Trial Court Cause No. F-1620143-K**

## MEMORANDUM OPINION

Before Justices Pedersen, III, Garcia, and Kennedy
Opinion by Justice Garcia

A jury convicted appellant of murder and assessed punishment at life in prison. Appellant now argues the trial court erred: (i) by refusing to admit evidence of his mental illness during the guilt-innocence phase of trial, (ii) by refusing his requested jury instruction on insanity, and (iii) by including an incorrect jury instruction on good conduct time in the punishment charge. Appellant further argues that the judgment should be modified to accurately reflect his jail time credits, the amount of costs, and that he pleaded not guilty to the charged offense. In a cross-point, the State argues the judgment should also be modified to reflect the correct statute for the charged offense. We modify the judgment and as modified, affirm.

# I.  Background

Appellant, who suffers from schizophrenia, shot his father and stepmother in their home as they slept. He shot his father eight times, and his stepmother twice, including a shot to the head. According to appellant, "She-God," a voice in his head, asked appellant if he would kill his family for her.

Appellant's stepmother died immediately, but appellant's father survived. When his father called for help, appellant played music on his portable speaker. When the calls became louder, appellant increased the volume of the music.

Appellant remained in the home for approximately two hours after shooting his parents. As his father called for help, appellant used paint and chalk to draw upside-down crosses and other symbols on both levels of the home and to write the words "For Her" on the walls.

When the police arrived in response to appellant's father's triggering of an alarm, appellant answered the door with his hands up. He was arrested at the scene.

Appellant was interviewed by Detective William McGraw at the police station and the interview was recorded. During the interview, appellant acknowledged his understanding that he was there because he "killed his dad and stepmother."[1] He described his communication with She-God and said that he planned to kill his parents for two years. He further described preparing for the crime the day before the offense.

---

[1] At that juncture, appellant was apparently unaware that his father, Robert Dixon, survived.

Appellant also gave a written statement. He said that he shot a full magazine of a 9mm pistol into his father and stepmother and "after the shooting, [his] stepmother died instantly, while [his father] screamed in agony for nearly three hours." The statement also said, "My father and stepmother were not murdered out of spite or any other negative emotion; simply For Her."

When the interview concluded, appellant was provided a telephone to call his mother, Mildred Dixon. During that call, appellant told Ms. Dixon he would be sentenced to death or life in prison for the offense.

Appellant was charged with murder for the death of his stepmother. Upon initial evaluation, he was found incompetent to stand trial and was hospitalized for treatment. After receiving medical treatment, he was reevaluated and found competent to stand trial.

Prior to trial, appellant gave notice of his intent to present evidence of insanity. The court appointed Dr. Lisa Clayton to examine appellant and determine his mental state at the time of the offense. Dr. Clayton concluded that appellant was actively psychotic at the time of the offense but did not meet the legal test for insanity because he understood the consequences of his actions. In a subsequent hearing to determine the admissibility of Dr. Clayton's testimony on the issue of insanity during the guilt-innocence phase of trial, the judge ruled the testimony inadmissible.[2] At the time of

---

[2] Dr. Clayton testified during the punishment phase of trial.

the ruling, however, the judge also said that the issue would be revisited if the issue was raised by other evidence at trial.

The jury found appellant guilty of murder and assessed punishment at life imprisonment. This timely appeal followed.

## II.   Analysis

**Excluding Mental Illness Testimony**

Appellant's first issue argues the trial court erred in excluding testimony concerning his mental illness at the guilt-innocence stage of trial. Specifically, appellant argues the court erred by excluding Ms. Dixon's testimony that: (1) appellant began exhibiting negative behaviors in high school when he was living with her; (2) she could hear him in his room talking and yelling late at night; (3) she took him to a psychiatrist for his symptoms of depression, withdrawal and insomnia; (4) the bottom of the forms the doctor gave her said "schizoid" and something else that she could not read; (5) she reviewed appellant's recorded police interview and it was her opinion "that was not her son"; and (6) she believed her son committed the offense in this case because he has schizophrenia. According to appellant, the State opened the door for this testimony through three of its witnesses.[3]

We review the trial court's exclusion of evidence for an abuse of discretion. *See Billodeau v. State*, 277 S.W.3d 34, 39 (Tex. Crim. App. 2009). As long as a trial

---

[3] The trial court did not exclude Ms. Dixon's testimony in its entirety. After the ruling limiting her testimony, the defense elected not to present her testimony at all.

court's decision is within the zone of reasonable disagreement, no abuse of discretion occurs. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000).

Texas law presumes that a criminal defendant intended the natural consequences of his acts. *Ruffin v. State*, 270 S.W.3d 586, 591 (Tex. Crim. App. 2008). Evidence that is relevant to negate that intent, including evidence of a defendant's history of mental illness, mental diseases, or defects may be admissible. *Id*. at 593–595. But such evidence may still be excluded if it does not meet the requirements under the evidentiary rules and if it does not truly negate the required mens rea. *Id*. at 595–96; *see also Mays v. State*, 318 S.W.3d 368, 381 (Tex. 2010) (mental illness testimony may be relevant for mitigation during the punishment phase, but "expert testimony that does not directly rebut the culpable mental state usually may be excluded at the guilt phase."); *Warner v. State*, No. 05-22-00155-CR, 2023 WL 3316745, at *3 (Tex. App.—Dallas May 9, 2023, no pet. h.) (mem. op., not designated for publication) (no error in excluding proffered testimony because it did not rebut or disprove mens rea).

During the presentation of its case-in-chief, the State called Officer Brian Scott-Lee to testify about his response to officers' request for backup at the crime scene. Officer Scott-Lee testified that appellant opened the door to the Dixon home at officers' request. The prosecutor asked the officer whether he thought a person who immediately lifted his hands in the air upon seeing an officer at the door seemed

oblivious to what was happening. Officer Scott-Lee responded that it seemed to him that such a person understood he was in trouble and was saying, "hey, you got me."

The State also elicited testimony from another officer at the scene, Officer Richard Incremona. Officer Incremona testified that he pulled appellant out of the house after appellant opened the door, patted appellant down, and handcuffed him. When asked if appellant was coherent, answered questions, and seemed to know that Officer Incremona was a police officer, the officer responded affirmatively.

Appellant's father, Robert Dixon, testified extensively about his relationship with appellant and appellant's relationship with his stepmother. Appellant's relationship with his stepmother was good, and appellant was always loving and accepting towards her.

Appellant lived with his mother, Ms. Dixon, in Illinois in the years prior to the offense, but had previously lived with his father in Dallas. Dixon said he did not notice any significant personality or behavior changes in appellant in the months prior to the commission of the offense.

Prior to the offense, appellant attended a family event in Missouri with his stepmother and Dixon. Dixon said appellant seemed coherent and there was nothing abnormal or unusual about his conversations with appellant during that time. Dixon also said that appellant did not seem depressed, sad, or angry.

Appellant was visiting his stepmother and Dixon in Dallas when he committed the offense. The evening before he shot his father and stepmother, appellant and his

father talked and played video games for a couple of hours. Appellant appeared to be in a good mood, and the things he and his father discussed made sense.

On cross-examination, Dixon said his ex-wife had called him about changes in appellant's behavior, including disrespect towards her, poor performance in school, and that appellant was no longer playing football. Ms. Dixon also told him that appellant was not sleeping and was playing video games by himself all night. Dixon attributed the differences in appellant's behavior with him and the behavior his ex-wife described to the fact that there was more structure in his household.

As cross-examination progressed, defense counsel requested a hearing, and the jury was removed. Counsel then renewed his request to present mental illness testimony, and specifically, wanted to question Dixon about whether his ex-wife sought psychiatric help for appellant. After hearing extensive argument from both sides, the judge ruled that counsel could question Dixon about whether he knew what his ex-wife did and if she took appellant to a doctor but could not inquire about a diagnosis. When the jury returned, Dixon testified that his ex-wife did not tell him what measures she was taking to address appellant's behavior, and only told him that she was taking appellant for speech therapy.

When the State rested, while the jury was out, defense counsel presented Detective McGraw's testimony to the court. In essence, Detective McGraw said he had concerns about appellant's mental state because he told the detective that "God" told him to commit the offense. When the testimony concluded, defense counsel re-

urged his request to present evidence of appellant's "diagnosis and scientific and psychiatric evidence" but did not seek to do so through Detective McGraw.[4] Instead, counsel proposed to do so through the testimony of Ms. Dixon, which was presented to the court outside the presence of the jury.

Ms. Dixon testified that appellant's demeanor, habits, and grades started to change at the end of tenth grade; that his grades fell from A's & B's to C's, D's, and F's; that he had been friendly and outgoing, but was no longer interacting with people outside of the house and was just spending his time in his room. Appellant used to be particular about how he dressed, but this changed, and he started wearing a hoodie, shorts, and flip-flops. Appellant was up in the middle of the night, yelling and talking very loudly. Ms. Dixon assumed he was on the phone; however, she later learned that there were no incoming or outgoing phone calls during the time he was yelling at night.

Ms. Dixon took appellant to a psychiatrist in August 2015 for his depression and withdrawal, his not sleeping, and all of his other symptoms. The form the psychiatrist gave her referred him to CBT (Cognitive Behavioral Therapy) and had something on the bottom about schizoid and something else. She stated that she discussed these issues with appellant's father and told him that she needed to get

---

[4] The jury did not hear Detective McGraw's testimony until the punishment phase of trial.

appellant help. Dixon responded that she should not take appellant to a psychiatrist because it would hurt appellant's chances of joining the Navy.

Ms. Dixon also testified that she reviewed the detective's interview with appellant, and despite what he told the detective, she did not believe that he understood that his conduct was wrong. She believed that appellant committed the offense because he has schizophrenia.

After hearing the testimony and argument from the parties, the trial judge ruled that Ms. Dixon would be allowed to testify during the guilt phase about the relationship between appellant and his father, if and to the extent she was aware of it, subject to the rule against hearsay. But Ms. Dixon would not be allowed to testify about appellant being up at night talking in his room, his subsequent mental health diagnosis, her opinions about why she thinks the murder happened, or her opinion that it was not "her son who did that."[5]

Both parties acknowledge that Texas does not recognize diminished capacity as an affirmative defense. *See Jackson v. State*, 160 S.W.3d 568, 573 (Tex. Crim. App. 2005). In fact, insanity is the only recognized defense pertaining to mental disease, defect, or abnormality. *See Ruffin v. State*, 270 S.W.3d at 593. Ms. Dixon's

---

[5] In the parties' arguments to the court, counsel noted that the Rule had not been invoked and Ms. Dixon had been present in the courtroom for all testimony, including the testimony of Dixon that she proposed to rebut. The trial court did not indicate whether this factored into her decision about the scope of permissible testimony.

testimony was not offered to prove insanity.[6] And appellant recognizes that evidence of mental illness that does not negate mens rea is inadmissible. *See Mays*, 318 S.W.3d at 380. Nonetheless, he maintains that Ms. Dixon's inadmissible testimony should have been admitted because the State opened the door for that evidence by leaving a false impression that invited response. *See Haydon v. State*, 296 S.W.3d 549, 554 (Tex. Crim. App. 2009) (evidence that is otherwise inadmissible may become admissible when a party opens the door to such evidence). We disagree.

The mens rea for murder is either knowing or intentional. *See* TEX. PENAL CODE ANN. § 19.02 (b) (1). A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." TEX. PENAL CODE ANN § 6.03(a). "A person acts knowingly . . . when he is aware of the nature of his conduct . . . [and] his conduct is reasonably certain to cause the result." *Id*. § 6.03(b). None of Ms. Dixon's proffered testimony negated the mens rea for the charged offense or showed that appellant's mental illness prevented him from forming the requisite intent. Ms. Dixon proposed to testify that appellant's grooming habits changed, and he made lower grades in school. He stayed up all night playing video games and she heard him talking and yelling in his room. She thought he committed

---

[6] Defense counsel argued to the court, "Even if we don't use the insanity defense, we feel like its relevant for them to have the full picture of all the facts."

the offense because he has schizophrenia. None of this testimony pertains to whether appellant was capable of knowingly and intentionally killing his stepmother. Likewise, his mental illness diagnosis does not address his mens rea. *See Williams v. State*, 502 S.W.3d 262, 276–277 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd) (proffered testimony that defendant was experiencing significant psychotic symptoms around time of offense and was suffering from depression and post-traumatic stress disorder did not address defendant's ability to form the intent to kill).[7] Because Ms. Dixon's testimony would not negate the mens rea, it was inadmissible.

The testimony the State elicited from officers Scott-Lee and Incremona did not open the door for Ms. Dixon's inadmissible testimony. Insanity was potentially at issue when appellant gave notice of his intent to raise that defense. The court's pretrial ruling did not foreclose the defense from seeking to admit insanity evidence at trial, and there is no indication that the defense had affirmatively abandoned that potential defense. Evidence about whether appellant appeared coherent the night of the offense, was able to respond to officer's questions, and displayed any indication that he knew his behavior was wrong was relevant to insanity. Ms. Dixon's testimony about appellant's behavior when he lived with her did not respond to the

---

[7] There was also some dispute about whether the records Ms. Dixon provided showed that appellant had been diagnosed with a mental illness.

officers' observations about appellant on the night of the offense, so there was no false impression to rebut.

Moreover, even if the officer's testimony opened the door for the admission of otherwise inadmissible evidence, the trial court still had discretion to exclude the evidence under Rule 403. *See Hayden*, 296 S.W.3d at 554. Rule 403 provides that relevant evidence may be excluded if the trial court determines that its probative value is substantially outweighed by the risk of unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence. *See* TEX. R. EVID. 403. In this instance, the trial court could reasonably have concluded that testimony about appellant's unusual behavior and mental illness would confuse the jury about the ultimate issue—whether appellant knowingly or intentionally shot his stepmother.

Ms. Dixon's testimony was also not admissible to rebut a false impression created by Dixon's testimony. Dixon's testimony about his relationship with appellant and appellant's behavior preceding the offense was relevant and admissible under article 38.36. *See* TEX. CODE CRIM. PROC. ANN. art. 38.36 (a).[8] Ms. Dixon's testimony did not address Dixon's testimony about his relationship with appellant or appellant's behavior prior to the offense. Further, Dixon did not deny or

---

[8] Article 38.36(a) provides that in a prosecution for murder, the state or defendant "shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense." *Id.*; *see also Garcia v. State*, 201 S.W.3d 695, 702 (Tex. Crim. App. 2006).

minimize that appellant displayed different behavior when he was with Ms. Dixon. He acknowledged during cross-examination that Ms. Dixon raised behavioral concerns and explained that he attributed the differing observations to the structure of the two households.

Significantly, the trial court did not rule that Ms. Dixon could not testify about the relationship between appellant and his father. To the contrary, the court expressly ruled that such testimony (which would have been responsive to Dixon's testimony) would be allowed. The defense, however, elected not to elicit any testimony from Ms. Dixon after the court limited the scope of permissible testimony.

Further, Ms. Dixon's testimony about appellant's psychiatric diagnosis would not rebut Dixon's testimony because he did not so testify. The trial court specifically ruled during cross-examination that such an inquiry would not be allowed.

We reject appellant's argument that "the answers given by these witnesses . . . left the false impression that appellant was acting normal, was able to talk, and was not psychotic." The issue is not whether appellant was psychotic or acting normally, but whether he was capable of forming the mens rea for the offense. *See Ruffin*, 270 S.W.3d at 591.

Under these circumstances, we cannot conclude the trial court abused its discretion by excluding Ms. Dixon's proffered testimony. *See Palmer v. State*, No. 05-14-00671-CR, 2015 WL 6859783, at *3–4 (Tex. App.—Dallas Nov. 9, 2015, pet. ref'd) (mem. op., not designated for publication) (no error in excluding evidence

–13–

concerning history of mental illness and current stressors because testimony dd not negate mens rea); *Gassaway v. State*, No. 05-07-00922-CR, 2009 WL 1547756, at *3–5 (Tex. App.—Dallas June 4, 2009, pet. ref'd) (mem. op., not designated for publication) (mental illness evidence did not negate mens rea). We resolve appellant's first issue against him.

**Insanity Instruction**

In his second issue appellant contends the trial court erred when it failed to submit a jury instruction on the affirmative defense of insanity. In accordance with the Texas Code of Criminal Procedure, Appellant filed notice of his intent to raise an insanity defense at trial. *See* TEX. CODE CRIM. PROC. ANN. art. 46C.051. At a pretrial hearing, appellant's expert, Dr. Lisa Clayton, testified that appellant did not meet the legal definition of insanity because he understood that his actions were illegal and that he would likely be arrested and sent to prison for his actions. The State's expert also conducted a pretrial insanity evaluation and reached the same conclusion. The trial judge ruled that based on what she had heard thus far, Dr. Clayton would not be permitted to testify about insanity, but she would revisit the matter if the issue was raised by other evidence at trial.

During the guilt-innocence phase of trial, appellant made no attempt to offer any testimony or other evidence of insanity. He nonetheless requested that insanity be submitted in the court's charge. The court denied his request.

–14–

"[A]ll alleged jury-charge error must be considered on appellate review regardless of preservation in the trial court." *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). In our review of a jury charge, we first determine whether error occurred; if no error occurred, our analysis ends. *Id*. If error occurred, whether it was preserved then determines the degree of harm required for reversal. *Id*.; *see Sandoval v. State*, No. AP-77,081, 2022 WL 17484313, at *28 (Tex. Crim. App. 2022). Where, as here, appellant raised a timely objection to the jury charge, we reverse if appellant suffered some harm as a result of the error. *See Sakil v. State*, 287 S.W.3d 23, 25–26 (Tex. Crim. App. 2009).

A defendant is entitled to an instruction on a defensive issue if the issue is raised by the evidence, whether that evidence is strong or weak, unimpeached or contradicted, and regardless of what the trial court may think about the credibility of the defense. *Ferrel v. State*, 55 S.W.3d 586, 591 (Tex. Crim. App. 2001). We review the evidence in the light most favorable to the defendant to determine whether a defensive issue should have been submitted. *Id*.

The affirmative defense of insanity applies if, "at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong." TEX. PENAL CODE ANN. § 8.01(a). A person may be suffering from delusions or other mental issues and be denied an insanity defense if he still understands that his actions are wrong. *See Grahm v. State*, 556 S.W.2d 941, 949 (Tex. Crim. App. 1978).

"In a case tried to a jury, the issue of the defendant's sanity shall be submitted to the jury only if the issue is supported by competent evidence." TEX. CODE CRIM. PROC. ANN. art. 46C.151(a). If evidence from any source raises the issue of insanity, the trial court must include an instruction on this defense in the jury charge. *Nutter v. State*, 93 S.W.3d 130, 131 (Tex. App.—Houston [14th Dist.] 2001, no pet.); *Jones v. State*, No. 05-12-00618-CR, 2013 WL 3717771, at *1 (Tex. App.—Dallas July 12, 2013, pet. ref'd) (mem. op., not designated for publication). Conversely, it is not proper to charge the jury on insanity if the evidence is insufficient to raise the issue. *Jeffley v. State*, 938 S.W.2d 514, 516 (Tex. App.—Texarkana 1997, no pet.).

The insanity defense focuses on whether the accused understood the nature of his action and whether he knew he should not do it. *Bigby v. State*, 892 S.W.2d 864, 877–78 (Tex. Crim. App. 1994). In the context of the insanity defense, the word "wrong" means illegal. *Ruffin*, 270 S.W.3d at 592. If the accused knows that his conduct is "illegal" by societal standards, then he understands that his conduct is wrong. *See id.*

Appellant argues that the circumstances of the offense, including the bizarre crime scene with the writings on the wall and his behavior after he committed the offense as depicted in the security footage, provided sufficient competent evidence to submit the insanity defense to the jury. Bizarre or abnormal behavior, however, is not sufficient to establish legal insanity. *See Kelly v. State*, 195 S.W.3d 753, 757 (Tex. App.—Waco 2006, pet. ref'd). Similarly, lay witness testimony about nervous

and unusual behavior and that a defendant does "not seem right in the head," is insufficient to raise the insanity defense. *Carreon v. State*, 08-12-00196-CR, 2014 WL 4243583, at *1 (Tex. App.—El Paso Aug. 27, 2014, no pet.) (mem op., not designated for publication); *Pacheco v. State*, 757 S.W.2d 729, 736 (Tex. Crim. App. 1988) (evidence that defendant was not himself, was acting abnormally and that he experienced mental disease or defect insufficient to raise insanity). The circumstances of the offense and the crime scene do not establish or suggest that appellant did not understand that his conduct was wrong, particularly in light of his behavior after the police arrived. *See Dashield v. State*, 110 S.W.3d 111, 116 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) (jury could infer from defendant's equivocation that he was debating rectitude of the assault and could therefore distinguish between right and wrong); *Pham v. State*, 463 S.W.3d 660, 672 (Tex. App.—Amarillo 2015, pet. ref'd) (evidence sufficient to support jury's implied rejection of insanity where evidence suggested defendant could distinguish from right and wrong).

Appellant also argues that some of the statements he made during his recorded interview with Detective McGraw, such as his statement about having a choice to kill his parents or go into the Navy were not "rational or sane" and supported submitting insanity to the jury. But Detective McGraw's testimony that appellant's statements were not "rational or sane" was presented outside the presence of the jury during the guilt-innocence phase, and appellant did not request that McGraw be

permitted to testify on insanity. Appellant's recorded interview with McGraw was not played until the punishment phase. Consequently, McGraw's testimony and the recorded interview do not support submission of the insanity issue to the jury.

Although the evidence may have suggested that appellant suffered from mental disease or defect, the existence of a mental disease, alone, is not sufficient to establish legal insanity; rather, the accused must have been mentally ill at the time of the offense to the point that he did not know his conduct was wrong. *Plough v. State*, 725 S.W.2d 494, 500 (Tex. App.—Corpus Christi 1987, no pet.).  The experts for both sides concluded that appellant did not satisfy the legal criteria for insanity. The evidence concerning the bizarre crime scene and the security footage of appellant's behavior after the offense was presented through lay witnesses, and none of these witnesses offered an opinion on insanity. *See Pacheco*, 770 S.W.2d at 735. Therefore, the trial court did not err by not submitting the insanity issue to the jury. *See Nutter*, 93 S.W.3d at 132; *Horton v. State*, No. 12-20-00032-CR, 2021 WL 1916703, at *4 (Tex. App.—Tyler, 2021, pet. denied) (mem. op., not designated for publication). Appellant's second issue is overruled.

**Good Conduct Instruction**

The trial court provided the jury with a punishment charge that submitted outdated parole instructions with language concerning good-conduct time. In his third issue, appellant correctly points out that Article 37.07, Section 4(a) of the Code of Criminal Procedure no longer refers to good-conduct time. *See* Act of May 26,

–18–

2015, 84th Leg., R.S., ch. 770, § 2.08, 2015 Tex. Gen. Laws 2321, 2366–68 (amended 2019) (current version at TEX. CODE CRIM. PROC. ANN. art. 37.07, § 4(a)). Instead, the current version of Section 4(a) refers only to parole. *See id*. The effective date of the amendment making this change was September 1, 2019, and the proceedings in this case took place in September 2021.

In reviewing a jury-charge issue, our first duty is to determine whether the charge contains error. *Hutch v. State*, 922 S.W.2d 166, 170 (Tex. Crim. App. 1996). The State concedes that including the outdated language concerning good-conduct time is error. Because appellant was sentenced after the 2019 amendment's effective date, we hold that there was error in instructing the jury regarding parole law using Section 4(a)'s pre-amendment language. *See* Act of May 26, 2015, 84th Leg., R.S., ch. 770, § 2.08, 2015 Tex. Gen. Laws 2321, 2366–68 (amended 2019) (current version at TEX. CODE CRIM. PROC. ANN. art. 37.07, § 4(a)); *Jones v. State*, No. 10-19-00350-CR, 2021 WL 4198452, at *4 (Tex. App.—Waco Sept. 15, 2021, no pet.) (mem. op., not designated for publication) (holding jury charge on parole was error).

When we find error in the charge, we next consider whether an objection to the charge was made, and we analyze the error for harm. *Price v. State*, 457 S.W.3d 437, 440 (Tex. Crim. App. 2015). Trial counsel did not timely object to the complained–of language in the punishment charge in the present case. Accordingly, we reverse only if appellant suffered egregious harm as a result of the error. *See* TEX. R. APP. P. 33.1.

"An egregious harm determination must be based on a finding of actual rather than theoretical harm." *Cosio v. State*, 353 S.W.3d 766, 777 (Tex. Crim. App. 2011). Errors that result in egregious harm are those that affect "the very basis of the case," "deprive the accused of a 'valuable right,'" or "vitally affect [a] defensive theory." *Id*. To determine whether harm was egregious, we consider four factors on a case-by-case basis: (1) the jury charge as a whole, (2) the state of the evidence, including contested issues and the weight of probative evidence, (3) the parties' arguments, and (4) all other relevant information in the record. *Arrington v. State*, 451 S.W.3d 834, 840 (Tex. Crim. App. 2015).

We first consider the entire charge to the jury in the punishment phase of the trial. *See Arrington*, 451 S.W.3d at 840. Although the charge erroneously included language about good conduct time that was no longer required under article 37.07, it also instructed jurors that they were "not to consider the extent to which good conduct time may be awarded to or forfeited by this particular defendant." We presume the jury followed the instructions given in the charge. *See Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005). Further, the charge correctly instructed the jury on the matters to be considered in deliberations, the range of punishment, and the requirement of unanimity.

We next consider the state of the evidence. Under this factor, we determine whether the evidence made it more or less likely that the charge error caused appellant actual harm. *Lehman v. State*, No. 05-19-01367-CR, 2022 WL 2155061,

at *9 (Tex. App.—Dallas June 15, 2022, no pet.) (mem. op., not designated for publication). We must determine "the likelihood that the jury would in fact have reached a non-unanimous verdict on the facts of this particular case." *Id.* (internal quotation omitted). Here, the state of the evidence supports appellant's life sentence.

The defensive theory at the punishment phase was that appellant was experiencing a psychotic episode due to schizophrenia and he shot his parents because he heard a voice from "God." When Detective McGraw interviewed appellant, he told the detective that "God" needed him to kill his parents. The day before the shooting, appellant collected all the guns in his father's house so that his father could not access a gun. He wrote a note stating that he was taking the lives of his father and stepmother out of love for "Her" ["God"]. The night before the murder, appellant was in his parents' bedroom for two hours as they slept. On the day of the shooting, appellant test fired his gun to ensure it was working properly.

Appellant was in his parents' home the night of the shooting. He waited until they went to bed, entered their bedroom, and shot them. He shot his stepmother in the head and in the right forearm. He shot his father eight times—once in the back, twice in his leg, twice in the shoulder, and three times in his stomach. When appellant's father realized he had been shot, he called out for appellant. Appellant turned music on his portable speaker. When his father yelled again, appellant turned the music up louder.

After shooting his father and stepmother, appellant remained in the house for approximately two hours before the police arrived. During that time, while his father cried for help, appellant used chalk and paint to draw several symbols and phrases in various rooms. On the ground floor, he drew fourteen upside-down crosses and six hearts in paint and an upside down cross in chalk. The words "For Her" were written in chalk twenty-three times. On the second floor, there were fifteen upside-down crosses, two hearts, and nine horizontal lines drawn in paint. The words "For Her" were written in chalk twenty-four times.

The defense expert testified that although appellant knew that he would go to jail as a result of his actions, if he did not have schizophrenia, or if his schizophrenia had been treated, he would never have committed the offense. Conversely, the State's expert testified that despite his schizophrenia, she believed appellant could have controlled his behavior.

No evidence regarding possible parole or good conduct time was offered during the guilt-innocence or the punishment phase of trial. Likewise, there was no mention of parole or good conduct time during voir dire.

We conclude the state of the evidence made it less likely that the jury charge caused appellant actual harm. Consequently, this factor weighs against finding egregious harm. *See id.*

Next, we consider whether any arguments made by the State or appellant exacerbated or ameliorated error in the charge. *Id*. at *10. Neither party discussed

–22–

good conduct time in argument or urged the jury to assess a greater or lesser sentence based on any potential good conduct time credit. *See Luquis v. State*, 72 S.W.3d 355, 367 (Tex. Crim. App. 2002). Indeed, other than the erroneous language in the charge, there was no mention of parole or good conduct time by anyone at any time. As we have noted, the charge instructed the jury not to consider the award or forfeit of good conduct time. Because no arguments exacerbated the error, this factor weighs against finding egregious harm. *See Atkinson v. State,* 107 S.W.3d 856, 860 (Tex. App.—Dallas 2003, no pet.).

Last, we consider any other relevant information, such as whether the jury sent requests for clarification during deliberations. *See Lehman*, 2022 WL 2155061, at *9*. After twenty minutes of deliberation during the punishment phase, the jury sent a note that said, "Does the assignment of life in prison mean the defendant is not eligible for parole?" The trial court responded, "You have received all the law in this case. Please continue your deliberations." The punishment verdict was returned approximately one hour later.

As appellant correctly observes, a note from the jury concerning parole or good conduct time weighs in favor of harm. *See Ritchey v. State*, No. 11-20-00035-CR, 2022 WL 3649433, at *5 (Tex. App.—Eastland Aug. 25, 2022, no pet.) (mem. op., not designated for publication); *Hooper v. State*, 255 S.W.3d 262, 272 (Tex. App.—Waco 2008, pet. ref'd). It does not, however, conclude the inquiry. *See Igo*

–23–

*v. State*, 210 S.W.3d 645, 647 (Tex. Crim. App. 2006) (applying egregious harm standard by weighing all four factors).

Appellant insists that the jury note suggests the erroneous instruction caused the jury to assess punishment at life in prison. But we do not consider the existence of a note in a vacuum. Other facts offer equally plausible explanations for the jury's punishment assessment. Although appellant received the maximum possible sentence, that is unsurprising given the heinous nature of his crime. Moreover, both the defense expert and the State's expert testified that it was not safe for appellant to be in the community because there was no assurance that appellant would continue to take his medication, that the medication would continue to work, or that appellant would not have another psychotic episode. Thus, although the jury's note weighs in favor of harm, other factors suggest that even if the jury improperly considered parole, it was not their sole consideration.

In so concluding, we distinguish this case from our court's opinion in *Shamburger v. State*, 05-20-00108-CR, 2021 WL 2430903, at *7 (Tex. App.—Dallas June 15, 2021, no pet.) (mem. op., not designated for publication). In *Shamburger*, our court concluded that the appellant was egregiously harmed by an erroneous good conduct instruction. *See id.* at *8. The *Shamburger* jury sent a note inquiring about appellant's payment of fines "during his parole." *Id.* Unlike the present case, however, in *Shamburger*, we noted that "from the beginning of the prosecution, the State raised the issue of the impact of parole on appellant's

–24–

sentence." *Id*. Accordingly, we concluded that "the jury was focused on the way parole, and, by extension, good conduct time might impact appellant." *Id*. There was no such focus or emphasis here.

Weighing all the harm factors, we conclude that appellant has not demonstrated a reasonable likelihood that the jury assessed a higher sentence based on the erroneous instruction and the record does not support a finding of egregious harm. *See Taylor v. State*, No. 05-20-00017-CR, 2022 WL 17335689, at \*13–14 (Tex. App.—Dallas Nov. 30, 2022, pet. ref'd) (mem. op., not designated for publication) (concluding erroneous good conduct instruction did not cause egregious harm); *Addison v. State*, No. 05-18-01263-CR, 2020 WL 4251068, at \*4 (Tex. App.—Dallas July 24, 2020, no pet.) (mem. op., not designated for publication) (same). Appellant's third issue is resolved against him.

**Modification of the Judgment**

In his fourth, fifth, and sixth issues appellant argues that the judgment should be modified to (i) accurately reflect his pre-sentence jail time credits, (ii) accurately reflect the amount of costs authorized to be assessed against appellant, and (iii) reflect appellant's "not guilty" plea. The State agrees, and adds in a cross-point, that the judgment should also be modified to reflect the correct statute for the offense for which he was convicted.

We are authorized to reform a judgment to make the record speak the truth when we have the necessary information to do so. *Bigley v. State*, 865 S.W.2d 26,

27 (Tex. Crim. App. 1993). The record supports the requested modifications here. We therefore sustain appellant's fourth, fifth, and sixth issues and the State's cross-point and modify the judgment accordingly.

### III. Conclusion

We resolve appellant's first three issues against him and sustain his fourth, fifth, and sixth issues and the State's cross point. We modify the judgment, and as modified, affirm.

/Dennise Garcia/
DENNISE GARCIA
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)
210847F.U05



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

ROBERT DIXON, Appellant

No. 05-21-00847-CR          V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court No. 4, Dallas County, Texas
Trial Court Cause No. F-1620143-K.
Opinion delivered by Justice Garcia. Justices Pedersen, III and Kennedy participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows: to reflect that appellant pleaded not guilty to the charged offense, to delete the $1 jury fee and $25 specialty court fees, to reduce the courthouse security fee to $5, to reduce the consolidated fee on conviction to $133, with such modifications and deletions to reflect total costs of $207, to reflect that appellant was charged and convicted under Penal Code § 19.02(b), and to award appellant a total of 1940 days pre-sentence jail time credit.

As **REFORMED**, the judgment is **AFFIRMED**.

Judgment entered June 16, 2023